957 F.2d 953
 Jessica A. MANARITE, By and Through Her Next Friend, Carla
MANARITE, and Carla Manarite as Administratrix of
the Estate of Timothy Murray,
Plaintiffs, Appellants,
v.
CITY OF SPRINGFIELD, Paul J. Fenton, Individually and in his
Official Capacity as Former Chief of Police, Michael Somers
and John Lynch, Individually and in Their Official Capacity
as Police Officers, Defendants, Appellees.
 No. 91-1491.
 United States Court of Appeals,
First Circuit.
 Heard Oct. 8, 1991.
Decided March 5, 1992.
 
 Stewart T. Graham, Jr., Springfield, Mass., for plaintiff, appellant.
 Edward M. Pikula, Asst. City Sol., Springfield, Mass., with whom Edward P. Reardon, Reardon & Reardon, Worcester, Mass., Kevin B. Coyle, Coyle, Dunbar & Geoffrion, Bruce L. Leiter, City Sol., Springfield, Mass., were on brief, for defendants, appellees City of Springfield, Paul J. Fenton and John Lynch.
 Austin M. Joyce, with whom Reardon & Reardon, Worcester, Mass., was on brief, for defendant, appellee Michael Somers.
 Before BREYER, Chief Judge, TORRUELLA, Circuit Judge, and WOODLOCK,* District Judge.
 TORRUELLA, Circuit Judge.
 
 
 1
 The Civil Rights Act, 42 U.S.C. § 1983, forbids state officials from depriving individuals of "any rights, privileges or immunities secured by the Constitution." In this appeal, we review the standards governing the liability of a municipality and its police chief under the Act for their alleged failure to prevent the suicide of a pretrial detainee and the issue of whether a minor child may assert a claim under the Act for loss of companionship and support of a natural parent.
 
 
 2
 * On May 11, 1984, at approximately 4:45 p.m., two Springfield police officers encountered Timothy Murray in a highly intoxicated state on Main Street. The officers took Mr. Murray into protective custody and transported him to the Springfield police station. Mr. Murray was advised of the availability of a detoxification center and he expressed his desire to be taken to the center. However, since no beds were available there, he remained at the Springfield police station and was placed in the protective custody lock-up. Mr. Murray informed the officer on duty that he had been in protective custody before, and that he had been held at the Hampden County Jail on drug charges three days earlier.
 
 
 3
 Officers Michael Somers and John Lynch were in charge of booking Mr. Murray. Officer Somers observed Mr. Murray to be highly intoxicated, unable to stand, to have slurred speech and to be indifferent to the booking procedure. Mr. Murray, however, exhibited no outward manifestations of suicidal tendencies.
 
 
 4
 In 1980, the Massachusetts Department of Public Safety issued new guidelines and procedures for implementation of the Protective Custody Law. Mass.Gen.L. ch. 111B, § 8. The new guidelines and procedures specified certain items to be removed from anyone held in protective custody, including shoelaces. These guidelines and procedures were disseminated to every officer of the Springfield police department by order of the Springfield police Chief, defendant Paul Fenton. They were also posted in the booking area.[1]
 
 
 5
 During the protective custody booking process, Officer Lynch prepared an inventory sheet for Mr. Murray, but failed to take Mr. Murray's shoelaces. Mr. Murray was placed in cell number 34, and routinely checked every thirty minutes.[2] He was the only person held in that aisle of cells.
 
 
 6
 At approximately 7:30 p.m., an officer found Mr. Murray hanging from the bar of the cell door with a shoelace tied around his neck. All efforts to resuscitate Mr. Murray by the officers and emergency medical personnel were unsuccessful, and he was pronounced dead at 7:53 p.m.
 
 
 7
 Jessica Manarite, the daughter of the decedent, and Carla Manarite, the administratrix of the decedent's estate, brought suit against the two booking police officers, the police chief and the City of Springfield under Section 1983 alleging that these defendants acted with deliberate indifference in violation of the constitutional rights of the decedent and plaintiff Jessica Manarite.[3]
 
 
 8
 After completion of discovery, the defendants filed motions for summary judgment. The district court heard argument on those motions and entered judgment for all defendants on April 23, 1991. Plaintiffs appeal the grant of summary judgment as to Chief Fenton and the City of Springfield.[4] We affirm.
 
 II
 
 9
 We review the district court's grant of summary judgment de novo to determine whether there is any genuine issue of material fact and whether the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 324-25, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).
 
 
 10
 We view the record in the light most favorable to plaintiffs and indulge all inferences favorable to them. Space Master Int'l, Inc. v. Worcester, 940 F.2d 16, 17 (1st Cir.1991). The materiality of a fact is determined according to the substantive law that governs the dispute. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A material fact creates a genuine issue for trial "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.
 
 III
 
 11
 The Supreme Court has made clear that Section 1983 permits recovery for loss of life (or for serious physical harm) only where the defendant acts intentionally or with an analogous state of mind usually described as "deliberate indifference" to deprivation of the victim's constitutional right. Wilson v. Seiter, --- U.S. ----, 111 S.Ct. 2321, 2323, 115 L.Ed.2d 271 (1991) ("deliberate indifference" standard in Eighth Amendment prison conditions case); Canton v. Harris, 489 U.S. 378, 388-90, 109 S.Ct. 1197, 1204-06, 103 L.Ed.2d 412 (1989) (same in Fourteenth Amendment municipal liability, police denial of medical treatment case); Estelle v. Gamble, 429 U.S. 97, 104-06, 97 S.Ct. 285, 291-92, 50 L.Ed.2d 251 (1976) (same in Eighth Amendment prison medical treatment case).
 
 
 12
 The Supreme Court has also made clear that, by "deliberate indifference," it means more than ordinary negligence, and probably more than gross negligence. Canton, 489 U.S. at 388 n. 7, 109 S.Ct. at 1204 n. 7 ("some [lower] courts have held that a showing of 'gross negligence' " is adequate, "[b]ut the more common rule is ... 'deliberate indifference' "); Daniels v. Williams, 474 U.S. 327, 328, 106 S.Ct. 662, 663, 88 L.Ed.2d 662 (1986) (civil rights laws do not permit recovery based on simple negligence).
 
 
 13
 Although some courts have used language suggesting that the deliberate indifference standard includes simple negligence--see, e.g., Elliott v. Cheshire County, 940 F.2d 7, 10-11 (1st Cir.1991) (defendant "reasonably should have known" of detainee's suicidal tendencies)--in their application of the deliberate indifference standard, courts have consistently applied a significantly stricter standard. In DeRosiers v. Moran, 949 F.2d 15 (1st Cir.1991), for example, this court stated that deliberate indifference requires
 
 
 14
 the complainant [to] prove that the defendants had a culpable state of mind and intended wantonly to inflict pain ... While this mental state can aptly be described as "recklessness," it is recklessness not in the tort-law sense but in the appreciably stricter criminal-law sense, requiring actual knowledge [or wilful blindness] of impending harm, easily preventable.
 
 
 15
 Id. at 19 (citations omitted); Gaudreault v. Salem, 923 F.2d 203, 209 (1st Cir.1990) (standard of " 'reckless' or 'callous' indifference" for supervisors' liability), cert. denied, --- U.S. ----, 111 S.Ct. 2266, 114 L.Ed.2d 718 (1991); Walker v. Norris, 917 F.2d 1449, 1455-56 (6th Cir.1990) ("deliberate indifference" standard in supervisory liability case); Berry v. Muskogee, 900 F.2d 1489, 1496 (10th Cir.1990) (same); Sample v. Diecks, 885 F.2d 1099, 1117-18 (3d Cir.1989) (same).
 
 
 16
 The cases also indicate that, when liability for serious harm or death, including suicide, is at issue, a plaintiff must demonstrate "deliberate indifference" by showing (1) an unusually serious risk of harm (self-inflicted harm, in a suicide case), (2) defendant's actual knowledge of (or, at least, willful blindness to) that elevated risk, and (3) defendant's failure to take obvious steps to address that known, serious risk. The risk, the knowledge, and the failure to do the obvious, taken together, must show that the defendant is "deliberately indifferent" to the harm that follows. See, e.g., (1) risk: Torraco v. Maloney, 923 F.2d 231, 236 (1st Cir.1991) (requiring "strong likelihood, rather than mere possibility, that self-infliction of harm will occur" (citation omitted)); Cortes-Quinones v. Jimenez-Nettleship, 842 F.2d 556, 560 (1st Cir.) (placing schizophrenic prisoner in badly overcrowded cell "a recipe for an explosion" and "death"), cert. denied, 488 U.S. 823, 109 S.Ct. 68, 102 L.Ed.2d 45 (1988); (2) knowledge: Gutierrez-Rodriguez v. Cartagena, 882 F.2d 553, 562-66 (1st Cir.1989) (supervisors' knowledge of risk inferred from many complaints of officer's violent behavior); Layne v. Vinzant, 657 F.2d 468, 471 (1st Cir.1981) (supervisor must have "actual notice" of risk); Popham v. Talladega, 908 F.2d 1561, 1564 (11th Cir.1990) (absent knowledge of suicidal tendencies, "cases have consistently held that failure to prevent suicide" does not "constitute deliberate indifference"); Anderson v. Atlanta, 778 F.2d 678, 682-84, 686 (11th Cir.1985) (supervisors' knowledge inferred from complaints of understaffing); (3) obvious steps: Voutour v. Vitale, 761 F.2d 812, 821 (1st Cir.1985) (police chief's failure to see that firearms training provided, despite statute requiring such training for officers), cert. denied, 474 U.S. 1100, 106 S.Ct. 879, 88 L.Ed.2d 916 (1986); see also DesRosiers, 949 F.2d at 19 (suggesting that a finding of deliberate indifference may lie where harm was easily preventable).
 
 
 17
 Using such standards in a case where a police officer shot an innocent plaintiff, we found the officer's supervisor liable, because citizen complaints and prior incidents had made the supervisor aware of the policeman's frequently brutal behavior, the supervisor had repeatedly dismissed complaints against the officer without making any effort to consider the officer's prior history of misconduct, and the supervisor administered a "grossly deficient" and "bankrupt" complaint procedure that inhibited proper police discipline. Gutierrez-Rodriguez, 882 F.2d at 564-66. Similarly, the Third Circuit has found a municipality "deliberately indifferent" to a detainee suicide risk where the municipality did not provide any suicide-prevention training to police officers, and also failed to adopt known, inexpensive suicide-prevention measures (such as directives to keep intoxicated detainees under restraint or observation, or not to house them alone in an empty cellblock), applicable to a detainee who had demonstrated suicide-risk symptoms. Simmons v. Philadelphia, 947 F.2d 1042, 1064-65, 1072-75 (3d Cir.1991).
 
 
 18
 On the other hand, where police departments have promulgated commonplace suicide-prevention policies, courts ordinarily have found supervisors not liable, i.e., not to have been "deliberately indifferent" to deprivation of the detainee's "right to life," even if officers did not always follow the department's policy and even if other, better policies might have diminished suicide risks. See, e.g., Belcher v. Oliver, 898 F.2d 32, 34-36 (4th Cir.1990) (no liability; officers failed to remove belt and shoelaces, although ordinary practice and chief's directive was to do so; no "objective evidence" that victim was a special suicide risk, although better screening procedures might have identified him as such); Edwards v. Gilbert, 867 F.2d 1271, 1276 (11th Cir.1989) (no liability for suicide although a better, more up-to-date screening procedure might have identified victim as a risk requiring special procedures); Molton v. Cleveland, 839 F.2d 240, 246-47 (6th Cir.1988) (only negligence, not deliberate indifference, to detainee's suicide risk where, after eight suicides in a decade, city adopted suicide prevention policies, including removal of belts and surveillance of despondent persons, but still gave officers little suicide-prevention training), cert. denied, 489 U.S. 1068, 109 S.Ct. 1345, 103 L.Ed.2d 814 (1989).
 
 A. Chief Fenton
 
 19
 It is well established that a supervisor "may be found liable [under Section 1983] only on the basis of her [or his] own acts or omissions." Gutierrez-Rodriguez, 882 F.2d at 562 (quoting Figueroa v. Aponte-Roque, 864 F.2d 947, 953 (1st Cir.1989)). Supervisory liability may arise from "deliberate indifference" to a class of persons. Appellants here must show a seriously elevated risk of suicide, Chief Fenton's knowledge of that risk, and Chief Fenton's failure to take obvious remedial steps, to the point where his culpability considerably exceeds negligence and, because it is "reckless" or "callous" or wanton, amounts to "deliberate indifference" to suicides in his jail.
 
 
 20
 The record contains evidence of the following key facts:
 
 
 21
 (1) Risk of suicide. In the three years before Murray's suicide, sixteen detainees attempted suicide in the Springfield lockup. In the preceding nine months, four detainees tried to hang themselves with shoelaces, an item that state and departmental policies tell police officers to remove from prisoners. Ten of the other twelve attempts involved items of clothing that these policies permit prisoners to retain, such as shirts, sweaters and socks.
 
 
 22
 (2) Knowledge. Chief Fenton knew of the suicide attempts. He received, and read, a special report about each suicide attempt. Although he knew of the four attempts with shoelaces, he says, without contradiction, that he did not realize that department policies called for the removal of a prisoner's shoelaces.
 
 
 23
 (3) Obvious steps. In January 1980, Chief Fenton promulgated commonplace suicide prevention policies, requiring officers to remove belts, shoelaces, neckties, necklaces, neckchains, matches, cigarette lighters and other "articles which may pose a danger of harm." He told commanding officers to distribute copies of the policies to all officers (and they were posted on the bulletin board of the jail where Murray was held in protective custody). In mid-1981, Fenton promulgated additional suicide-prevention policies. In May, officers were required to check detainee cells every half hour. In June, officers were told to take special steps if a detainee showed suicidal tendencies (e.g., informing a superior officer, posting an officer near the cell, providing for transfer to a mental health facility). In July, Fenton told all commanding officers to "acquaint themselves" with protective custody procedures (including suicide-prevention procedures). The record also indicates that the Department had "no formal training program in suicide prevention" but it provided "in service" suicide-prevention training and it has sent some officers to a special suicide-prevention seminar.
 
 
 24
 Fenton's basic shortcomings, as far as the record reveals, were (1) a failure to realize, from the suicide reports, that an unusual number of suicide attempts involved shoelaces, which Department policies said that officers should remove; and (2) a consequent failure to insist that officers implement the specific shoelace policy. In retrospect, particularly when the four shoelace-related attempts are brought to our attention all at one time, it is tempting to say that Fenton should have noticed a kind of systemic failure and should have made certain that all Department officers carried out the shoelace removal policy. Yet, given the large number of detailed policies implemented by any police department and given the fact that suicide reports likely cross a supervisor's desk one at a time, over a period of many weeks or months and mixed with many other urgent matters, it may, in fact, prove difficult for a chief to recollect (or notice) that department policies call for removal of shoelaces, along with belts (but not shirts). Still, given the number of recent shoelace suicide attempts (four), the chief's failure to take immediate corrective steps might well be negligent. But we fail to see how, without more evidence, one could call it "deliberate indifference."
 
 
 25
 Roughly comparable cases support this view. No case finds a supervisor "deliberately indifferent" (or the like) simply because he does not react when he learns of a significantly increased suicide attempt rate. Courts, including this one, have found supervisors to be deliberately indifferent only where a much fuller record than we have before us shows significantly more culpable behavior (or omissions). See Gutierrez-Rodriguez, 882 F.2d at 564-66; cf. Simmons, 947 F.2d at 1064-65, 1072-75. Where one finds typical suicide prevention policies in place, at least some officer training, and records as empty of additional supporting detail as is this one, courts have consistently found no "deliberate indifference." See Belcher, 898 F.2d at 34-36; Edwards, 867 F.2d at 1276; Molton, 839 F.2d at 246-47.
 
 B. The City of Springfield
 
 26
 Municipal liability under Section 1983 cannot be based on respondeat superior. Monell v. Department of Social Services, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Municipal liability lies only when a municipal policy or custom causes the alleged constitutional deprivation. Canton v. Harris, 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). Municipal liability
 
 
 27
 attaches where--and only where--a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question.
 
 
 28
 Pembaur v. Cincinnati, 475 U.S. 469, 483, 106 S.Ct. 1292, 1300, 89 L.Ed.2d 452 (1986).
 
 
 29
 In Canton, the Supreme Court held that under certain limited circumstances a municipality may be "liable under 42 U.S.C. § 1983 for constitutional violations resulting from its failure to train municipal employees." 489 U.S. at 380, 109 S.Ct. at 1200. The Court made clear that an inadequacy in police training may provide the basis for Section 1983 liability whenever the municipality's failure to train its officers "amounts to deliberate indifference to the rights of persons with whom the police come into contact." Id. at 388, 109 S.Ct. at 1200.
 
 
 30
 In this case, the City of Springfield implemented guidelines and procedures to prevent persons held in protective custody from inflicting harm on themselves. In the spring of 1984, three officers of the police department attended a seminar on suicide prevention at the Worcester police department. At the time of the decedent's suicide, the City had implemented the following additional policies to prevent suicides:
 
 
 31
 (1) a call-in emergency mental health network for detainees with an obvious need for counseling;
 
 
 32
 (2) checking the cell block on a half-hour basis by officers, and to ascertain compliance by the police officers, time clocks had to be punched;
 
 
 33
 (3) on cases involving protective custody due to intoxication, the police department contacted the detoxification center;[5]
 
 
 34
 (4) any detainee known to be a suicide risk was placed under constant observation.
 
 
 35
 Plaintiffs assert that the City of Springfield was deliberately indifferent by failing to provide training and education for the police officers of the City of Springfield in suicide detection and prevention. However, the evidence in this case indicates that in 1984 such failure at most constitutes negligence--it does not rise to the level of deliberate indifference required under Canton. "Only where a failure to train reflects a 'deliberate' or 'conscious' choice by a municipality--a 'policy' as defined by our prior cases--can a city be liable for such a failure under § 1983." 489 U.S. at 389, 109 S.Ct. at 1204. Significantly, plaintiff's own expert conceded that the City's training and policies in 1984 regarding suicide prevention were in accord with the requirements of state law at the time of the decedent's suicide.
 
 
 36
 Furthermore, Canton requires a plaintiff to show "both the existence of a policy or custom and a causal link between that policy and the constitutional harm." Santiago v. Fenton, 891 F.2d 373, 381 (1st Cir.1989). Plaintiffs here are unable to meet the causation element of Canton, which requires proof that "the identified deficiency in a city's training program must be closely related to the ultimate injury." 489 U.S. at 391, 109 S.Ct. at 1206. There is no basis here for finding that the decedent's suicide is closely related to the failure of the City of Springfield to train its officers in suicide prevention.
 
 
 37
 Plaintiffs have failed to adduce evidence of how a properly trained police officer in 1984 would have known, or would have to have been willfully blind not to have noticed, that the decedent posed a strong risk of suicide, particularly since the decedent exhibited no manifestations of suicidal tendencies. In fact, Mr. Murray told the officer on duty at the Springfield police department that he had been held in protective custody before, and that he had been held at the Hampden County Jail on drug charges three days earlier. These statements would lead a reasonable, properly trained officer, sensitive to the needs of intoxicated and potentially suicidal persons, to assume that the decedent did not present a high risk of suicide.
 
 
 38
 The only evidence plaintiff has offered is that the booking officers' negligent failure to follow established procedures, namely, removal of the shoelaces of persons held in protective custody, led to the decedent's suicide. This evidence, however, is insufficient to create a genuine issue of fact as to whether the police officers of the City of Springfield were inadequately trained in 1984. In Canton, the Supreme Court noted
 
 
 39
 [t]hat a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program ... It may be, for example, that an otherwise sound program has occasionally been negligently administered. Neither will it suffice to prove that an injury could have been avoided if an officer had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct. Such a claim could be made about almost any encounter resulting in injury, yet not condemn the adequacy of the program to enable officers to respond properly to the usual and recurring situations with which they must deal. And plainly, adequately trained officers occasionally make mistakes; the fact that they do says little about the training program or the legal basis for holding the city liable.
 
 
 40
 489 U.S. at 390-91, 109 S.Ct. at 1206 (internal citation omitted).
 
 
 41
 In sum, there is no question that far from demonstrating deliberate indifference to the mental health needs of intoxicated and potentially suicidal detainees, the record shows that, in 1984 the policies implemented by the City of Springfield demonstrate an effort to ensure the safety of persons like the decedent.
 
 IV
 
 42
 In count III of the complaint, plaintiff Jessica Manarite, the daughter of the decedent, asserts that defendants' failure to prevent the decedent's suicide violated her right to familial associational privacy--a liberty interest protected by the substantive due process clause. The district court concluded that Jessica had no liberty interest protected by the due process clause in her familial relationship with her father. We agree.
 
 
 43
 In Ortiz v. Burgos, 807 F.2d 6 (1st Cir.1986) and Pittsley v. Warish, 927 F.2d 3 (1st Cir.1991), we held that a plaintiff may assert a violation of a right to familial associational privacy only when the state action is directly aimed at the parent-child relationship.
 
 
 44
 In Ortiz, this court reviewed the Supreme Court's precedents involving the familial liberty interest. These precedents fall generally into two categories. The first category of cases holds that the substantive due process prevents governmental interference in "certain particularly private family decisions." Id. at 8 (citing as examples Griswold v. Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965); Pierce v. Society of Sisters, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925); Moore v. City of East Cleveland, 431 U.S. 494, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977)). The second category holds that the substantive due process clause requires strict adherence to procedural protections whenever the "state seeks to change or affect the relationship of parent and child in furtherance of a legitimate state interest ..." Ortiz, 807 F.2d at 8 (citing as examples Santosky v. Kramer, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); Little v. Streater, 452 U.S. 1, 101 S.Ct. 2202, 68 L.Ed.2d 627 (1981); Stanley v. Illinois, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972)).
 
 
 45
 Ms. Manarite's familial association claim falls under neither of these two categories. In failing to prevent decedent's suicide, the defendants were not interfering with "an individual's right to choose how to conduct his or her family affairs." Ortiz, 807 F.2d at 8. More fundamentally, there is no evidence to draw an inference that the defendants' failure to take preventive action was directly aimed at severing or affecting the parent-child relationship. As this court stated in Pittsley:
 
 
 46
 [The] second category is implicated whenever the state directly seeks to change or affect the parent-child relationship. State action that affects the parental relationship only incidentally, however, even though the deprivation may be permanent, as in the case of unlawful killing by the police, is not sufficient to establish a violation of a identified liberty interest. Ortiz, 807 F.2d at 8. Therefore, only the person toward whom the state action was directed, and not those incidentally affected, may maintain a § 1983 claim [for a violation of the familial association right].
 
 
 47
 927 F.2d at 8 (emphasis added).
 
 
 48
 Viewing the record in the factual light most favorable to Ms. Manarite, we agree with the district court that she has no protected liberty interest for familial association under the facts of this case.
 
 
 49
 Affirmed.
 
 
 
 *
 Of the District of Massachusetts, sitting by designation
 
 
 [1]
 The guidelines provided in pertinent part:
 
 
 [13]
 An incapacitated person held in protective custody at the police station shall have the following property taken from him for safekeeping in accordance with departmental procedures:
 a. belts, shoe laces, kneckties (sic), knecklaces (sic), kneckchains (sic), matches, and cigarette lighters;
 b. all other articles which may pose a danger or harm to such person or to others; ...
 
 
 [2]
 According to the Springfield police department policy, all of the cells are checked every half hour
 
 
 [3]
 In addition, the complaint alleged violations of Massachusetts tort law
 
 
 [4]
 Plaintiffs have voluntarily dismissed their appeal as to the booking officers, defendants Michael Somers and John Lynch
 
 
 [5]
 A procedure that was followed in this case