Emory G. SNELL, Plaintiff,

v.

John F. DeMELLO, Sheriff; James Fredricks, Superintendent; Larry Dubois, Commissioner; and Mark Thompson, Lt. Winniekein, Lt. Semprini, and John Awalt, Section Officers, Defendants.

Civil Action No. 95–12513–GAO.

United States District Court,
D. Massachusetts.

March 31, 1999.

---

Emory G. Snell, Jr., South Walpole, MA, for plaintiff.

Robert S. Troy, Bourne Town Counsel, Sandwich, MA, for defendants.

Michael H. Cohen, Bridgewater, MA, for Larry DuBois.

## MEMORANDUM AND ORDER

O'TOOLE, District Judge.

In this action, plaintiff Emory G. Snell, a prisoner in the custody of the Massachusetts Department of Corrections, asserts that the defendants, acting under the color of state law, failed to protect him from attack by another inmate. He alleges this failure deprived him of his right to be free from cruel and unusual punishment, as guaranteed by the Eighth and Fourteenth Amendments to the United States Constitution. Snell is suing the defendants in their professional and individual capacities, and is seeking damages as well as injunctive and declaratory relief under 42 U.S.C. § 1983. The defendants have moved for summary judgment on all counts. For the reasons set forth below, their motions are GRANTED.

### Background

The facts in the record, viewed in a light most favorable to Snell, are as follows. Snell is serving a term of life imprisonment at the Massachusetts Correctional Institution, Cedar Junction ("MCI–Cedar Junction"), as a result of his conviction for the murder of his wife. Prior to his trial, Snell was detained at the Barnstable County Jail and House of Correction ("Barnstable facility") between March 20, 1995 and September 1, 1995. At the time of the events alleged in the complaint, defendant John DeMello was the Barnstable County sheriff and James Fredricks was superintendent of the Barnstable facility. Mark Thompson, John Awalt and Lieutenants Winniekein and Semprini were section officers at the Barnstable facility. The seventh defendant, Larry Du-Bois, was the Commissioner of Corrections for the Commonwealth of Massachusetts.

In his complaint, Snell claims that he suffered injury as a result of the deliberate indifference by the defendants to his physical and mental well being, as well as his safety and medical needs, during the time he was in their custody. Specifically, Snell alleges he notified the "Administration" that he was having problems with several inmates in Housing Unit C, to which he had been assigned. Snell testified in an affidavit that he had conversations with DeMello and Semprini in which he indicated that he had received threats of bodily harm from other inmates. Snell has proffered an April 15, 1995, letter directed to the attention of defendants DeMello, Fredericks and Semprini, in which he informed them that he had been threatened on several occasions by an inmate by the name of Ken Patti and asked to be moved to an alternate housing unit in order "to prevent any further aggression or physical assault." He attests that the April 15 letter was addressed properly and placed in a mailbox serving the internal mail system at the Barnstable facility.

On or about May 4, 1995, Snell was transferred to an alternate housing unit, but on May 12, 1995, he was ordered back to Housing Unit C. Snell protested to defendants Awalt, Thompson and Winniekein that his initial move out of Housing Unit C

had been made to ensure his safety. His return to Housing Unit C was then delayed until May 26, 1995, at which time he repeated his protests to Awalt, Thompson and Winniekein and requested a meeting with the Barnstable facility shift supervisor. Snell's request was denied and he was returned to Housing Unit C under threat of administrative force and disciplinary action.

On or about May 27, 1995, Snell submitted a formal inmate grievance concerning his return to Housing Unit C and the defendants' alleged indifference to his safety. He indicates that the grievance was directed to the attention of Superintendent Fredericks, but he does not explain what procedures were followed in making the grievance or how it was submitted to Fredricks. A search of internal files at the Barnstable facility has resulted in no record of the grievance. The record does not indicate that any action was taken in response to the grievance.

Snell claims that on June 11, 1995, while in Housing Unit C, an unidentified inmate assaulted him from behind, causing him to lose consciousness. He alleges that his property was then packed up by other inmates and that he was told to "leave the C section housing unit or die."

The night of the assault, Snell was taken to the infirmary at the Barnstable facility where he was provided with Tylenol and ice. Shortly thereafter, Snell was examined by a staff doctor who detected a loss of hearing in his left ear and an impairment of his sight. On July 6, 1995, Snell received audio and visual tests at the Shattuck State Hospital, which also indicated a loss of hearing in his left ear. The examining physician at the hospital recommended that Snell be returned at a later date for an MRI and further examination.

After his conviction on September 1, 1995, Snell was transferred to MCI–Cedar Junction. He claims that he was transferred from the Barnstable facility without his medical records, and consequently he did not receive the recommended MRI or any other medical attention since the time of his conviction and his subsequent transfer from the Barnstable facility to MCI–Cedar Junction.

On February 26, 1996, Snell amended his complaint, adding former Commissioner of Corrections DuBois as a defendant in both his official and individual capacities. Snell alleges that Commissioner DuBois was "conspiring not to train" corrections personnel regarding the protection of inmates. Snell has proffered a letter which he typed on or about May 19, 1995, in which he requests intervention by Commissioner DuBois relating both to threats of bodily harm made against him, and the alleged indifference on the part of prison officials. Snell does not state whether the letter was in fact sent to Commissioner DuBois. However, he does allege that Commissioner DuBois failed to respond to his letter, and through his deliberate indifference, contributed to the violation of his Eighth Amendment right to be free of cruel and unusual punishment.

## Analysis

Summary judgment is proper when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c); *Woodman v. Haemonetics Corp.*, 51 F.3d 1087, 1091 (1st Cir.1995). The moving party bears the initial burden of showing the absence of any material facts in the record. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d ·265 (1986). Once done, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue of material fact as to each issue upon which he would bear the ultimate burden of proof at trial." *Hodgens v. General Dynamics Corp.*, 144 F.3d 151, 158 (1st Cir.1998) (internal quotations omitted) (quoting *Anderson v. Liberty*

*Lobby Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). In doing this, the non-moving party "may not rest upon the mere allegations ... of his pleading, but ... must set forth specific facts showing that there is a genuine issue for trial." *Conway v. Boston Edison Co.*, 745 F.Supp. 773, 777 (D.Mass.1990) (internal quotations omitted) (quoting *First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253, 288, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)).

## The § 1983 Claims

To establish liability under 42 U.S.C. § 1983, a party must prove that the challenged conduct is "attributable to a person acting under color of state law," and that the conduct "worked a denial of rights secured by the Constitution or by federal law." *Soto v. Flores*, 103 F.3d 1056, 1061 (1st Cir.), *cert. denied,* —— U.S. ——, 118 S.Ct. 71, 139 L.Ed.2d 32 (1997). In the present case, only the second issue is in dispute: specifically, whether conduct or omissions on the part of defendants De-Mello, Fredericks, DuBois, Thompson, Winniekein, Semprini and Awalt deprived Snell of his federally protected rights.

Snell does not claim that any of the defendants directly deprived him of any constitutional right. Rather, Snell alleges that having been put on notice of the threats made against him, each defendant had knowledge that Snell was in danger of assault at the hands of fellow inmates housed at the Barnstable facility. Even with the knowledge that Snell faced a substantial risk of serious harm, as correctional officers and supervisors, they failed to take action necessary to alleviate that risk of harm. According to Snell, this amounted to a violation of his Eighth Amendment right to be free of cruel and unusual punishment.

## Supervisory Liability

Supervisory liability under § 1983 may not be predicated only on the theory of respondeat superior. *See Mal-*donado–Denis v. Castillo–Rodriguez*, 23 F.3d 576, 581 (1st Cir.1994); *Gutierrez-Rodriguez v. Cartagena*, 882 F.2d 553, 562 (1st Cir.1989). "A supervisor may be found liable only on the basis of his own acts or omissions." *Febus–Rodriguez v. Betancourt–Lebron*, 14 F.3d 87, 91–92 (1st Cir.1994); *Bowen v. City of Manchester*, 966 F.2d 13, 20 (1st Cir.1992). Moreover, mere negligence by the supervisor is not enough to create liability. *See Febus–Rodriguez*, 14 F.3d at 92; *Manarite v. City of Springfield*, 957 F.2d 953, 956 (1st Cir.), *cert. denied,* 506 U.S. 837, 113 S.Ct. 113, 121 L.Ed.2d 70 (1992). In a case such as this, supervisory liability may be found only when a supervisor's acts or omissions "amount to a reckless or callous indifference to the constitutional rights of others," often referred to as deliberate indifference. *Febus–Rodriguez*, 14 F.3d at 92; *see also Maldonado–Denis*, 23 F.3d at 582 (stating "a supervisor may be held liable for what he does (or fails to do) if his behavior demonstrates deliberate indifference to conduct that is itself violative of a plaintiff's constitutional rights"). To demonstrate deliberate indifference, a plaintiff must show that he faced an unusually serious risk of harm, that the defendant in question had actual knowledge of that elevated risk, and that the defendant failed to take obvious steps to address that serious risk. *Manarite*, 957 F.2d at 956. Finally, a plaintiff must "affirmatively connect the supervisor's conduct to the subordinate's violative act or omission." *Maldonado–Denis*, 23 F.3d at 582.

The test for determining supervisory liability has become clear in light of the Supreme Court's decision in *Farmer v. Brennan*, 511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). In *Farmer*, the Court held that for a supervisor's actions to amount to deliberate indifference, the official must be "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837, 114 S.Ct. 1970. There must be both an

objective basis from which the supervisor could conclude that a risk of harm to the inmate exists, and a subjective belief by the official that the risk does in fact exist. It is not enough to say that a reasonable person "should have known" of the risk. *Id.* at 843 n. 8, 114 S.Ct. 1970. The standard for deliberate indifference is not negligence, but rather the equivalent of criminal recklessness. *Id.* at 839, 114 S.Ct. 1970; *Manarite,* 957 F.2d at 956. "[A]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot ... be condemned as the infliction of punishment." *Farmer,* 511 U.S. at 838, 114 S.Ct. 1970. Rather the plaintiff must show that the supervisor himself subjectively drew the inference that there was an excessive risk of harm and then did nothing to prevent or forestall it from materializing.

### Supervisory Officials: DeMello, Fredricks and DuBois

■ Snell has offered no evidence which connects any acts or omissions by Sheriff DeMello, Superintendent Fredricks, or Commissioner DuBois to a deprivation of his constitutional rights. Nor has he shown that any of the defendant supervisors possessed the criminally reckless, culpable state of mind from which deliberate indifference results. Specifically, there is nothing in the record which indicates that prior to the alleged assault on June 11, 1995, any of the defendant supervisors either knew of a substantial, serious risk to Snell's physical safety or harbored a subjective belief that he faced potential injury at the hands of other inmates in Housing Unit C.

Snell alleges that he had conversations with DeMello during which he stated that he was receiving threats of physical harm from other inmates in Housing Unit C, although the details of such conversations are lacking. Without more specific evidence, it would border on speculation to infer that DeMello had information from which he would have concluded that Snell faced "a substantial risk of serious harm" at the hands of other inmates. *See Farmer,* 511 U.S. at 837, 114 S.Ct. 1970. For the purposes of a summary judgment motion, however, it may be assumed that the DeMello was put on notice of the threats through conversations with the plaintiff.

Nevertheless, while the conversations between Snell and DeMello may have provided an objective basis for concluding that the plaintiff faced some risk, Snell does not offer evidence sufficient to show that DeMello subjectively believed that Snell faced a substantial risk of injury if he were assigned to Housing Unit C. Without such a showing, a trier of fact simply cannot reach the conclusion that DeMello possessed a culpable state of mind or that his conduct was criminally reckless and therefore deliberately indifferent. *See Manarite,* 957 F.2d at 956; *DesRosiers v. Moran,* 949 F.2d 15, 19 (1st Cir.1991).

Snell also claims his April 15, 1995, letter addressed to DeMello and Fredricks informed these two defendants of his safety concerns. He offers in evidence an unsigned copy of this letter, in which he indicates that he had been threatened by a fellow inmate and that he wanted himself or the inmate in question to be transferred to an alternate housing unit. Snell claims that he properly addressed the letter to DeMello and Fredricks and placed it in a mailbox serving the internal mail system at the Barnstable facility. If it could be concluded that the April 15 letter had been sent through a regular and reliable system of delivery, then it would be reasonable to infer that it had been successfully delivered. *See* Fed.R.Evid. 406; *Federal Kemper Life Assurance Co. v. Ellis,* 28 F.3d 1033, 1040 (10th Cir.1994). However, the record provides no information about the regularity and reliability of the internal mail system at the Barnstable facility, thus depriving the desired inference of successful delivery to DeMello and Fredricks of its necessary predicate. *Id.* DeMello and Fredricks have both denied receiving the

April 15 letter, and the defendants say that no record of it exists in the facility's files. Moreover, it would not be reasonable for a trier of fact to conclude that any of the defendants received the April 15 letter simply because the trier disbelieved their testimony that they had not received it. *See Bose Corp. v. Consumers Union of U.S.*, 466 U.S. 485, 512, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984) ("When the testimony of a witness is not believed, the trier of fact may simply disregard it. Normally, the discredited testimony is not considered a sufficient basis for drawing a contrary conclusion."); *Moore v. Chesapeake & O. Ry. Co.*, 340 U.S. 573, 576, 71 S.Ct. 428, 95 L.Ed. 547 (1951) ("Disbelief of . . . testimony [does] not supply a want of proof.")

Assuming, however, that DeMello and Fredricks had received the April 15 letter, the proof of the defendants' subjective state of mind is still inadequate. In the letter, Snell wrote "I have been threatened on more than one occasion by Ken Patti, [and] I would appreciate you either moving him or me to another unit, to prevent any further aggressions or physical assault." As with Snell's oral notification of DeMello, the limited facts presented by the April 15 letter may possibly provide an objective basis for the inference that the plaintiff faced some risk of injury. It does not however provide any basis for the conclusion that from limited facts in the letter either DeMello or Fredricks developed a subjective belief that Snell faced substantial risk of serious harm. *See Farmer*, 511 U.S. at 839, 114 S.Ct. 1970.

On May 4, 1995, Snell was transferred to an alternate housing unit, and on May 12 was ordered back to Housing Unit C.[1] Snell protested his return to Housing Unit C, and his placement there was delayed until May 26 when the transfer occurred. On May 27 Snell submitted a formal inmate grievance to Superintendent Fredricks concerning his return to Housing Unit C and the defendants' alleged indifference to his safety. Unlike the April 15 letter, no copy of the grievance is offered. Snell does not describe in detail what information it contained. Without more evidence, it would be impossible for a rational trier of fact to draw an inference about Fredricks' subjective state of mind after reading the grievance. Without such evidence it would be impossible for a trier of fact to conclude that any act or omission on the part of Fredricks reached the level of criminal recklessness upon which a supervisor's liability for deliberate indifference hinges. *See Farmer*, 511 U.S. at 839, 114 S.Ct. 1970; *Manarite*, 957 F.2d at 956.

Snell also claims to have notified former Commissioner of Corrections DuBois by letter of the threats made against him by inmates at the Barnstable facility, and of indifference on the part of Barnstable personnel to his safety. Snell has proffered an unsigned copy of a May 19, 1995, letter addressed to Commissioner DuBois without saying that he sent the correspondence to DuBois. Even if the letter had been sent and received, there is no evidence supporting an inference that DuBois subjectively recognized the existence of a genuine threat to Snell's welfare, and was reckless and deliberately indifferent to the consequences of doing nothing.[2]

---

1. The reason for the May 4 transfer does not appear. No evidence is offered that would tend to show it was related to his complaint nor that it was not.

2. Snell also claims that Commissioner DuBois was "conspiring not to train" prison officials regarding the safety of inmates. Liability for failure to train under § 1983 is proper only in cases where there is proof that "the identified deficiency in the training program [is] closely related to the ultimate injury." *See City of Canton v. Harris*, 489 U.S. 378, 391, 109 S.Ct.

1197, 103 L.Ed.2d 412 (1989). The record does not indicate that as Commissioner of Corrections, DuBois was involved with personnel training or other issues related to the daily management of the Barnstable facility. It appears such matters were the direct responsibility of county officials in charge of overseeing county correctional facilities. Snell not only relies impermissibly on mere allegations of his pleading in claiming that DuBois conspired not to train Barnstable personnel, but he also fails to connect the Com-

The defendants DeMello, Fredricks and DuBois cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless they clearly knew of and disregarded an excessive risk to Snell's health or safety. *See Farmer,* 511 U.S. at 837, 114 S.Ct. 1970. Snell has fallen well short of showing that the defendant supervisors were reckless in a tort law sense. *See Manarite,* 957 F.2d at 956. More importantly he has failed to show that they possessed a culpable state of mind that was reckless in the appreciably stronger criminal law sense, and that with actual knowledge of easily preventable harm, they did nothing to remedy an increased risk of injury to the plaintiff. *Id.* In sum, Snell fails to set forth specific facts necessary to show that there is a genuine issue for trial concerning claims of supervisory liability made against defendants DeMello, Fredricks and DuBois. *See* Fed.R.Civ.P. 56(c); *Woodman,* 51 F.3d at 1091.

### Section Officers: Semprini, Awalt, Thompson & Winniekein

■ The record fails to provide any evidence indicating that officers Semprini, Awalt, Thompson and Winniekein were acting in a supervisory capacity. The record suggests rather that the defendants were acting strictly in the capacity of prison line officers without supervisory authority over prison policy. However, assuming that the nature of their job provided these officers with discretion over inmates sufficient to impose upon them supervisory responsibilities, as with the other defendants, the evidence still fails to show that they possessed the culpable state of mind or engaged in the criminally reckless behavior upon which supervisory liability rests.

*See Farmer,* 511 U.S. at 839, 114 S.Ct. 1970.

Snell indicates that as with Sheriff DeMello, Semprini was informed of the threats made against Snell through conversations with Snell and through the April 15 letter. As with DeMello, the evidence is that Snell informed Semprini of threats made against him by other inmates, but it does not include any specific facts from which it could be properly inferred that Semprini had a subjective appreciation that Snell faced an elevated risk of harm.

On Snell's version of events, officers Awalt, Thompson and Winniekein, while performing discretionary functions, caused him to be returned to Housing Unit C on May 26, 1995, though they were fully aware that he had previously been removed from that unit on May 4, 1995, for his own safety. Beyond informing Awalt, Thompson and Winniekein during his protest that he had been in receipt of threats and was removed from Housing Unit C for his own safety, Snell offers no evidence that he provided any of these officers with specific information from which they would necessarily have inferred the existence of an increased risk of danger to the plaintiff if returned to that housing unit.

While for present purposes Snell's version of events is accepted for what it is worth, it is noteworthy that section officers at the Barnstable facility kept detailed files in which they recorded on a daily basis inmate grievances in incident reports and progress notes. In Snell's file there are no reports submitted by officers Awalt, Thompson and Winniekein indicating that Snell had informed them of threats made

missioner's conduct to any violative acts or omissions by subordinates at the Barnstable facility. *See Maldonado–Denis,* 23 F.3d at 582; *Conway,* 745 F.Supp. at 777. Nor does Snell identify any training program for correctional personnel, or any deficiency in such a program that relates to the injury he sustained as a result of the June 11, 1995, assault. *See Harris,* 489 U.S. at 391, 109 S.Ct.

1197. There is simply no evidence in the record of any failure by Commissioner DuBois to provide Barnstable personnel with training related to inmate safety, and thus there exists no genuine issue for trial under § 1983 relating to allegations of failure to train. Fed.R.Civ.P. 56(c); *Woodman,* 51 F.3d at 1091.

against him or that he was opposed to his return to Housing Unit C. Out of twenty-five reports spanning the entirety of Snell's stay at the Barnstable facility, only one incident report shows that Snell actually complained to a section officer about threats made by other inmates. The complaint, made to an officer Galvin, who is not party to this suit, indicated that Snell had received threats and wished to be moved from Housing Unit C. The complaint was made on June 11, *after* Snell had been attacked by the unidentified inmate.

Inmates may be moved among prison housing units for many reasons, and as noted above, nothing in the record indicates that Snell had in fact been removed from Housing Unit C on May 4, 1995, in order to ensure his safety. Moreover, Snell also has offered no evidence to show that Thompson, Awalt and Winniekein were under the impression that the plaintiff had previously been removed from that unit on May 4, 1995, for that reason. In fact, the record indicates that Snell had been transferred to alternate housing units on several occasions, but there is no indication that any transfer was motivated by a threat to Snell's welfare. For instance, on July 31, 1995, Snell was moved to Housing Unit B, not to ensure his safety but rather to be held pending an administrative decision relating to conduct in contravention of prison policy.

Several incident reports also indicate that Snell was a problematic and unruly inmate who often refused to adhere to prison regulations. A number of officers noted that Snell believed he was above policies guiding inmate conduct because he continued to ignore rules and regulations after several warnings and after the provision of a book on inmate behavior at the Barnstable facility. On several occasions, Snell had been warned for refusing to wear a prison identification bracelet, for failing to keep his quarters in compliance with prison hygiene standards, and he had been caught concealing medicine rather than taking it immediately as had been directed by the prison nurse. In light of his frequent misbehavior, it is conceivable that officers Thompson, Awalt and Winniekein were skeptical of the validity of Snell's protest, if he made one, and as a result, failed to develop a genuine belief that he would be at serious risk if returned to Housing Unit C. Snell has fallen well short of showing that officers Thompson, Awalt and Winniekein even knew of any risk of harm to the plaintiff, or that they genuinely believed he faced a heightened risk of injury if he were returned to Housing Unit C. Without such a showing, no trier of fact could reasonably conclude that officers Thompson, Awalt and Winnieken caused a denial of Snell's constitutional rights, or that their conduct was tantamount to deliberately indifferent behavior. *See Farmer,* 511 U.S. at 839, 114 S.Ct. 1970. Snell clearly fails to set forth specific facts necessary to show that there is a genuine issue for trial under § 1983 concerning the claims made against Section Officers Thompson, Awalt and Winniekein. *See Hodgens,* 144 F.3d at 158.

### Failure to Provide Adequate Medical Care

On Snell's account of events, the defendants, through their deliberate indifference, not only failed to protect him from a substantial risk of serious harm at the hands of other inmates, but they violated his rights under the Eighth and Fourteenth Amendments by failing to provide him with adequate medical care. It is well established that in all correctional settings, the deliberate indifference standard applies to allegations of failure to provide medical care in addition to the failure to protect. *See DesRosiers,* 949 F.2d at 19. Inadvertent failures to provide medical care, even if negligent, do not sink to the level of deliberate indifference. *Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986). In order to establish deliberate indifference, the complainant must prove that the defendants had a culpable state of mind and intended wantonly to inflict pain. *DesRosiers,* 949 F.2d at 19. The requisite state of mind may be

manifested by the officials' response to an inmate's known needs or by denial, delay or interference with prescribed health care. *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976).

 The record in this case, however, clearly refutes Snell's claim with respect to this count. It contains twenty-three medical request forms covering the duration of Snell's stay at the Barnstable facility. On each form, prison officials recorded each of Snell's various medical complaints and noted what action was taken by Barnstable officials and medical personnel in response. Prior to the June 11 assault, Snell received treatment for lower back problems. On one occasion Snell refused to receive treatment from the prison physician unless the doctor provided him with a particular prescription medication which he had demanded. Following the assault, Mr. Snell was taken immediately to the nurse where he was provided with ice and Tylenol. The following day he was treated by a physician under contract with the facility. He was also taken on June 14, 1995, to the Cape Cod Hospital for X-rays which showed no injury. In response to further complaints concerning his sight and hearing, Snell was sent to the Lemuel Shattuck Hospital, where the treating physician recommended an MRI. The MRI was then scheduled for July 24, 1995, at the New England Medical Center. Records kept by the Medical Department at the Barnstable facility indicate that Snell refused to submit to the MRI.

Snell also contends that his Eighth Amendment rights were violated when he was transferred to another correctional institution without medical records necessary for proper care. The record indicates that Snell signed a form at the Barnstable facility releasing his medical records to MCI—Cedar Junction, and that the records were subsequently mailed to that facility. He was also treated the same month at MCI—Cedar Junction by an optometrist, and has been provided with multiple pairs of eye glasses to correct his vision.

The record clearly refutes Snell's allegation that he was denied medical care by prison officials and that medical personnel were indifferent in their provision of treatment. *See Estelle,* 429 U.S. at 97, 97 S.Ct. 285; *Manarite,* 957 F.2d at 955. He fails even to show that there were inadvertent failures on the part of the defendants to provide him with medical care. *See Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986). To the contrary, the record indicates that the defendants responded quickly and effectively to all medical needs made known to them by Snell, and there was no apparent denial, delay or interference with the provision of health care to the plaintiff. *See Estelle,* 429 U.S. at 97, 97 S.Ct. 285.

### *Conclusion*

For all the reasons set forth above, the motions for summary judgment by defendants DeMello, Fredricks, Thompson, Winniekein, Semprini, Awalt and DuBois are GRANTED.

The Complaint is dismissed with prejudice.

It is so ORDERED.