Carleen BOWEN, etc., Plaintiff, Appellant,

v.

CITY OF MANCHESTER, et al., Defendants, Appellees.

No. 91–1957.

United States Court of Appeals, First Circuit.

Heard April 10, 1992.

Decided June 5, 1992.

Andru H. Volinsky, with whom Michael J. Sheehan and Shaheen, Cappiello, Stein & Gordon, P.A., were on brief, for plaintiff, appellant.

William A. Grimes, with whom McDonough & O'Shaughnessy, P.A., was on brief, for defendants, appellees.

Before TORRUELLA, Circuit Judge, COFFIN and CAMPBELL, Senior Circuit Judges.

TORRUELLA, Circuit Judge.

John Paul Bowen committed suicide in a holding cell at the police department headquarters of the City of Manchester, New Hampshire. His former wife, Carleen Bowen, in her capacity as administratrix of Mr. Bowen's estate, brought suit under the Civil Rights Act, 42 U.S.C. § 1983, and various state law provisions against the City of Manchester, Police Chief Thomas King, and Officer Michael DiSabato alleging that these defendants were "deliberately indifferent" to the serious risk that Mr. Bowen would commit suicide. The district court granted summary judgment for all defendants. For the reasons that follow, we affirm.

I

On July 24, 1986, detectives from the New Hampshire State Drug Task Force arrested Mr. Bowen for selling cocaine to an undercover agent. Mr. Bowen was transported to the police headquarters for the City of Manchester, where he was interviewed by Sergeant Wayne Richards. Mr. Bowen agreed to cooperate with the police and gave a statement admitting that he sold cocaine and had connections to other cocaine dealers.[1]

After the interview with Sergeant Richards, Mr. Bowen was taken to the booking area. Officer Phillip LeBlanc informed Mr. Bowen of the felony charges against him and allowed Mr. Bowen to make a number of calls to attempt to secure money for bail. Officer LeBlanc noted that Mr. Bowen was cooperative.[2] At the conclusion of one of the phone calls, Mr. Bowen told

Officer LeBlanc: "she's wicked, she told me I belong in here."[3] While Bowen was on the phone, the bail commissioner informed the police houseman that Mr. Bowen's bail had been raised from $1500 to $20,000. Upon overhearing the bail commissioner, Mr. Bowen became "very shocked and [nervous]."[4]

Sergeant Richards gave Mr. Bowen a shirt before locking him alone in a cell. Once Bowen was inside the cell, Officer LeBlanc gave him a cigarette. Although Mr. Bowen requested a blanket and a book of matches, Officer LeBlanc explained that he was prohibited from issuing these items, but he assured Mr. Bowen that he would return to light other cigarettes.[5]

On July 24, the officer responsible for the safety and supervision of the detainees held in the lockup, commonly referred to as the houseman, was Michael DiSabato. Officer DiSabato testified it was common practice for the houseman to leave the police station and drive the police wagon to the location of recent arrests in order to transport arrestees to the lockup.[6] That evening, Officer DiSabato left the lockup to pick up arrestees. Officer LeBlanc went with him to assist. Consequently, no officer of the Manchester police department was at the station for approximately 45 to 50 minutes after Mr. Bowen was arrested. During this period of time, Mr. Bowen tied one part of his shirt to the cell door and another part to his neck and hung himself by squatting.

Mr. Bowen's suicide was the second suicide in Manchester's police station during a period of three years. On May 19, 1983, an intoxicated detainee, Roger Parent, committed suicide at the station's lockup by hanging himself with his shirt.

At the time of Mr. Bowen's suicide, the City of Manchester offered no formal training to its police officers in the area of suicide screening for detainees. The Man-

---

1. Defendants' Exh. 2; Dep. of Richards at 5.

2. Dep. of LeBlanc at 18.

3. Def. Exh. 9; Dep. of LeBlanc at 20.

4. Plfs. Exh. 1; Dep. of DiSabato at 87–88.

5. Rep. of Officer LeBlanc; Def. Exh. 9.

6. Dep. of DiSabato at 39.

chester police department, however, had a standard operating procedure, which included a provision mandating that the houseman check all the detainees in the lockup every 15 minutes and special procedures to be followed if a potential suicidal detainee was identified.[7] In addition, as part of the regular roll call training in May of 1985, the department showed a film clip entitled "Avoiding Custody Deaths."[8]

Manchester's lockup has ten cells for detainees, arranged in two rows of five cells each. In July of 1986, two video cameras were installed to monitor the walkway in front of the cells. The cameras, however, failed to look directly into the cells. To monitor the sounds in the lockup, a two way intercom was placed in the dispatch area and the cellblock, but the evidence indicates that it was rarely turned on.[9]

After discovery was completed, the district court entered summary judgment for all defendants. The district court held that Officer DiSabato was entitled to qualified immunity and that Police Chief Thomas King and the City of Manchester were not deliberately indifferent to Mr. Bowen's rights. Plaintiff appeals.

## II

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment shall be entered against a party who, after adequate time for discovery, "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

The district court's decision to grant summary judgment is reviewed *de novo*. *Rivera–Muriente v. Agosto–Alicea, et al.*, 959 F.2d 349, 351–52 (1st Cir.1992); *Elliott v. Cheshire County*, 940 F.2d 7, 8 (1st Cir.1991). We read the record in the light most favorable to the appellant and indulge all inferences in favor of her claim in deter-

mining whether a genuine issue of material fact is present in this case, which would preclude the grant of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986).

## III

### A. *Qualified Immunity*

█ Appellant challenges the district court's conclusion that Officer DiSabato was entitled to qualified immunity from liability. The defense of qualified immunity shields "public officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Elliott*, 940 F.2d at 10 (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982)). "Unless the plaintiff's allegations state a claim of violation of clearly established law, a defendant pleading qualified immunity is entitled to dismissal before the commencement of discovery." *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S.Ct. 2806, 2815, 86 L.Ed.2d 411 (1985). Summary judgment should be granted if the defendant official can establish as a matter of law that a reasonable official in her position would have believed that her conduct did not violate clearly established law. *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987) ("The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.").

█ By 1986 it was clearly established that police officers violate the fourteenth amendment due process rights of a detainee if they display a "deliberate indifference" to the unusually strong risk that a detainee will commit suicide. *Colburn v. Upper Darby Tp.*, 946 F.2d 1017, 1023 (3d Cir.1991); *Elliott*, 940 F.2d at 10 (citing *Danese v. Asman*, 875 F.2d 1239, 1243 (6th

---

**7.** Standard Operating Procedure ("SOP"), Def. Exh. 14, at 10.

**8.** Def. Exh. 11, at 1; Dep. of DiSabato at 107.

**9.** Dep. of DiSabato at 47; Dep. of LeBlanc at 16.

Cir.1989), *cert. denied,* 494 U.S. 1027, 110 S.Ct. 1473, 108 L.Ed.2d 610 (1990); *Rellergert v. Cape Girardeau County, Mo.,* 924 F.2d 794, 796 (8th Cir.1991); *Buffington v. Baltimore County, Md.,* 913 F.2d 113, 119 (4th Cir.1990); *Partridge v. Two Unknown Police Officers,* 791 F.2d 1182, 1187 (5th Cir.1986).

The "deliberate indifference" standard means more than simple negligence. *Torraco v. Maloney,* 923 F.2d 231, 234 (1st Cir.1991). We have held, for example, that a plaintiff may establish deliberate indifference in a prison suicide case by showing

> (1) an unusually serious risk of harm (self-inflicted harm, in a suicide case), (2) defendant's actual knowledge of (or, at least, willful blindness to) that elevated risk, and (3) defendant's failure to take obvious steps to address that known, serious risk. The risk, the knowledge, and the failure to do the obvious, taken together, must show that the defendant is "deliberately indifferent" to the harm that follows.

*Manarite v. Springfield,* 957 F.2d 953, 956 (1st Cir.1992). Appellants must therefore show that a reasonable officer in the position of Officer DiSabato should have known that his actions, or willful failure to act, amounted to "deliberate indifference" to the serious risk that Mr. Bowen would commit suicide.

■ Appellant asserts that Officer DiSabato's conduct in abandoning the lockup to pick up other detainees and in failing "to understand the signals given by one at high risk [of] suicide [was] blatantly unreasonable." [10] Appellant's argument is wide off the mark. The issue is not whether Officer DiSabato's conduct was reasonable or not; rather the qualified immunity inquiry turns on whether an objective officer in Officer DiSabato's position would have reasonably believed that his conduct amounted to "deliberate indifference." We think the answer is no.

■ Deliberate indifference requires a showing by the plaintiff that the public official had actual knowledge, or was willfully blind, to the serious risk that a detainee would commit suicide. *Manarite,* at 956 (citing *DesRosiers v. Moran,* 949 F.2d 15, 19 (1st Cir.1991)); *Colburn,* 946 F.2d at 1024 (deliberate indifference requires "a level of culpability higher than a negligent failure to protect from self-inflicted harm"). Appellant has failed to adduce any evidence to lead a reasonable juror to infer that Officer DiSabato had actual knowledge, or willfully blinded himself, to the unusual and large possibility that Mr. Bowen would commit suicide. Officer DiSabato testified that he was responsible for making periodic checks of the detainees in the lockup.[11] Although he was not formally instructed to screen detainees for potential suicide victims, Officer DiSabato testified that one of the functions of the houseman was to observe a detainee's demeanor to determine his or her potential to commit suicide.[12] Mr. Bowen exhibited no manifestations of suicidal potential [13] and nothing in his criminal record evidenced a potential to commit suicide. Officer DiSabato found that Mr. Bowen behaved normally, cooperating in the investigation of his arrest and not turning violent.[14]

The failure of Officer DiSabato to remain at the station to monitor Mr. Bowen in the lockup can be characterized, in the best light for the non-movant, as negligence; it does not rise to the level of a "deliberate indifference" claim. We hold that in 1986

10. Brief of Appellant at 27.

11. Dep. of DiSabato at 33.

12. *Id.* at 60–61.

13. Appellants contend that the fact that Mr. Bowen became nervous after he was told that his bail had been raised was in itself sufficient indication that he was a suicide risk. We find no merit in this argument since there is no evidence that Mr. Bowen's nervousness was so extraordinary and unusual that a reasonable officer would have been alerted to an obvious need for medical care. *Cf. Gaudreault v. Municipality of Salem, Mass.,* 923 F.2d 203, 208 (1st Cir.1990) ("A medical need is 'serious' if it is one that has been diagnosed by a physician as mandating treatment, or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.").

14. Dep. of DiSabato at 113.

it was not obvious that Officer DiSabato's conduct violated clearly established law and therefore he is entitled to qualified immunity.

## B. *Municipal Liability*

■ The Supreme Court has made clear that a municipality can be held liable for constitutional violations arising from its failure to train employees. *Canton v. Harris*, 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1988). A municipality, however, cannot be held liable under Section 1983 on the basis of a *respondeat superior* theory "for such liability would violate the evident congressional intent to preclude municipal liability in cases in which the city itself was not at fault." *Oklahoma City v. Tuttle*, 471 U.S. 808, 828, 105 S.Ct. 2427, 2438, 85 L.Ed.2d 791 (1985) (Brennan, J., concurring in part, and in judgment).

■ Claims of inadequate training require proof that the failure to train was a policy or deliberate choice made by the municipality and that there is a direct link between the municipality's policy and the constitutional violation. *Canton*, 489 U.S. at 390, 109 S.Ct. at 1205; *Oklahoma City*, 471 U.S. at 823, 105 S.Ct. at 2436; *Manarite*, at 959. In the context of pre-trial detention suicides, a municipality will not be liable for failing to maintain a suicide-proof facility or for an isolated, negligent act committed by one of its police officers. *Cf. Pembaur v. Cincinnati*, 475 U.S. 469, 480, 106 S.Ct. 1292, 1298, 89 L.Ed.2d 452 (1986). ("[I]t is plain that municipal liability may be imposed for a single decision by municipal policymakers under *appropriate circumstances*.") (emphasis added). Appellant argues that the City of Manchester was "deliberately indifferent" to the constitutional rights of its detainees as evidenced

by (1) the design of the City's detention facilities; (2) its practice of leaving the facility unsupervised; and (3) its failure to train its employees to recognize suicidal detainees.

■ In appellant's view, the practices of the City and the conduct of its policymakers led to the design problems that existed at the time of Mr. Bowen's suicide. In particular, the City failed to modify the cell doors in the lockup to eliminate the possibility that another detainee would use the cell door bars to hang himself and failed to modify the video monitoring system to view the interior of the cellblock.[15] Since another detainee, Roger Parent, had committed suicide three years before Mr. Bowen, the City should have corrected these design failures. Additionally, appellant argues that the City had a policy or custom of leaving the lockup unattended and it failed to train its employees to screen for suicidal detainees.

Viewed in the best light for appellant, the evidence in this case indicates that the City was negligent, not deliberately indifferent. Although the record demonstrates that the City had no training in suicide prevention, in 1986 the Constitution required the City of Manchester to train its jail personnel to recognize and deal with the *obvious* medical needs of detainees. *See, e.g., Burns v. City of Galveston, Tex.*, 905 F.2d 100, 104 (5th Cir.1990) (right of detainees to adequate medical care does not "an absolute right to psychological screening").

There is no evidence here that even if the officers who came into contact with Mr. Bowen had been trained in screening for suicidal detainees, they could have prevented Mr. Bowen's suicide.[16] In cases involv-

---

15. Dep. of Louis J. Craig at 29–32.

16. Plaintiff's expert concludes that Mr. Bowen showed the following signs and symptons of potential suicide: (1) he was shocked and nervous upon being told that his bail had been raised; (2) he was apparently rejected by a female friend or loved one; (3) he stated that it was the first time that he "had done anything like this"; (4) he inquired about his charge and possible sentence at booking. Pls. Exh. 5 at 3.

We agree with the district court's conclusion that "[w]hile expert opinions plainly have some evidentiary value, summary judgment cannot be defeated by an expert's conclusory assertion about ultimate legal issues." Order, Civ. No. 88–085–S, at 9 (D.N.H. Aug. 16, 1991). If we were to uphold plaintiff's expert conclusion that Mr. Bowen's conduct amounted to clear signs of suicidal tendencies—when in fact Mr. Bowen's conduct was not indicative of specific or overt suicidal behavior, but are rather general in na-

ing the psychological needs of a potentially suicidal detainee, courts have found officials to have acted with deliberate indifference only when the detainee shows clear signs of suicidal tendencies and the officials had actual knowledge, or were willfully blind, to the large risk that the detainee would take his life. *See, e.g., Simmons v. Philadelphia,* 947 F.2d 1042, 1050 (3d Cir. 1991) (intoxicated detainee's behavior varied between confusion and hysteria for at least one hour after his arrest); *Buffington v. Baltimore County, Md.,* 913 F.2d 113, 116–17 (4th Cir.1990) (custodial officials had actual knowledge of strong suicidal tendencies of detainee). The police officers who came into contact with Mr. Bowen testified that he exhibited no manifestations of having suicidal tendencies. Officer LeBlanc had gained some experience in dealing with potentially suicidal detainees while working as a correctional officer in state prison.[17] He testified that Mr. Bowen did not show any sign of suicidal ideation. Sergeant Richards testified that he spent more than 30 minutes with Mr. Bowen and found him to be "very cooperative."[18] Sergeant Richards was surprised to learn that Mr. Bowen had committed suicide since Mr. Bowen had not given any indication of being suicidal.[19]

Furthermore, the City's Standard Operating Procedure ("SOP") for the police de-

partment's lockup provided that the houseman would check all of the detainees held in the lockup every fifteen minutes and included several procedures to follow when a potentially suicidal detainee was identified.[20] Finally, in May of 1985 as part of the regular roll call training, the police department screened a film entitled "Avoiding Custody Deaths." Although we reject the City's implied contention that this film by itself "trained" the police officers in the area of suicide detection, we agree with the district court's conclusion that appellant has failed to show that the City's failure to train here rose to the level of a constitutional deprivation. Appellant introduced no evidence that a properly trained police officer would have been able to reasonably detect Mr. Bowen as a suicide risk; rather the evidence indicates that only an extensive psychological evaluation of Mr. Bowen may have detected that he had suicidal tendencies.

Nor is there evidence that an atrociously high number of detainees committed suicide in Manchester's lockup to lead a reasonable juror to infer that these defendants, individually or jointly, were aware of a particular pattern indicating the need for medical treatment, but willfully blinded themselves to that unusual and large need.

The fact that the City's video monitoring system was deficient, since it failed to look

---

ture, i.e., being nervous that bail had been raised—then every detainee would be a presumptive suicide risk. The Constitution does not impose on custodial officials a duty to undergo extensive psychological training to guard against unknown suicide risks. *Danese v. Asman,* 875 F.2d 1239, 1244 (6th Cir.1989), *cert. denied,* 494 U.S. 1027, 110 S.Ct. 1473, 108 L.Ed.2d 610 (1990).

**17.** Dep. of LeBlanc at 29.

**18.** Dep. of Richards at 18, 22.

**19.** *Id.* at 27.

**20.** The SOP provided in pertinent part:
 G. Unusual Case Detainee Processing
 1. Violent, destructive, or suicidal persons:
  a. Prisoner under the influence of drugs or other substance and/or who are violent or suicidal. In these cases, the houseman shall:
   Isolate the prisoner in a cell and keep close observation on him.

If required, place the prisoner in the padded cell, as per Use of Padded Cells.
 B. Prisoners who are clearly suicidal shall remain under close observation at all times while they are in the custody of the Manchester Police Department.
   *   *   *   *   *   *
 J. Supervision of Prisoners
   *   *   *   *   *   *
 3. All Prisoners shall be visually checked by the houseman every 15 minutes throughout his tour of duty, other that [sic] when the houseman is booking prisoners. If a substantial time shall pass due to booking large numbers of prisoners, between checks, the houseman shall notify the Officer in Charge who shall designate another officer to check the prisoners until the houseman is finished.
 4. The houseman shall alert the Officer in Charge to any special case prisoners, such as those who may be suicidal, dangerous, destructive or under the influence of alcohol or drugs.

directly into the cells, and that the cell doors in the lockup were not modified after the Parent suicide in 1983, might support a finding that the City was negligent in failing to take additional measures to protect potentially suicidal detainees. Similarly, the repeated practice of leaving the lockup unattended for periods ranging from 15 minutes to an hour might well be—as appellant's expert concludes—a gross deficiency. But, taken together, these deficiencies do not amount to deliberate indifference. *See Manarite*, at 958–60 (negligent failure of City's employees to follow established procedure does not serve as basis to find that City acted with deliberate indifference); *Popham v. City of Talladega*, 908 F.2d 1561, 1565 (11th Cir.1990) (mayor's decision not to have guards on duty after 11:00 p.m. at the City's lockup "does not represent a discernible city policy to maintain an inadequately staffed, non-suicide proof jail facility"); *Santiago v. Fenton*, 891 F.2d 373, 381–82 (1st Cir.1989) (weakness in training police officers is insufficient to create a genuine issue of fact on whether municipality was deliberately indifferent to the constitutional right of its citizens).

Finally, the Supreme Court has made clear that liability for failure to train under Section 1983 is proper only in cases where there is proof that "the identified deficiency in a city's training program must be closely related to the ultimate injury." *Canton*, 489 U.S. at 391, 109 S.Ct. at 1206. As discussed earlier, appellant has introduced no evidence to raise a material fact on whether a properly trained police officer "would have known, or would have to have been willfully blind not to have noticed, that [Mr. Bowen] posed a strong risk of suicide," given that he showed no signs of suicidal ideation. *Manarite*, at 959.

We conclude that appellant presented no evidence to lead a reasonable jury to infer that a policy or custom of the City of Manchester may have inflicted a constitutional injury upon Mr. Bowen.

## C. *Supervisory Liability*

■ A supervisor may be held liable under Section 1983 "only on the basis of her own acts or omissions." *Figueroa v. Aponte–Rogue*, 864 F.2d 947, 953 (1st Cir. 1989). A plaintiff must show

that the supervisor's conduct or inaction amounted to a reckless or callous indifference to the constitutional rights of others. Finally, there must be an "affirmative link" between the street-level misconduct and the action, or inaction, of supervisory officials.

*Gutiérrez–Rodriguez v. Cartagena*, 882 F.2d 553, 562 (1st Cir.1989) (citations and internal citations omitted).

■ Appellant asserts that Chief King's conduct reflected deliberate indifference to the constitutional rights of Mr. Bowen because Chief King (1) was responsible for the policy of sending the houseman to pick up recent arrestees, thereby leaving the police station unsupervised; (2) failed to implement a more effective monitoring system in the lockup; and (3) failed to order training in suicidal screening.

In *Cartagena–Rodriguez*, we affirmed a jury verdict finding the Superintendent of the Police Department of Puerto Rico liable under Section 1983 for his deliberate indifference to the rights of the citizens of Puerto Rico as demonstrated by the Superintendent's failure to discipline a police officer who had a lengthy history of ruthless conduct and who shot the plaintiff. In *Gutiérrez–Rodriguez*, the evidence showed that

citizen complaints and prior incidents had made the [Superintendent] aware of the policeman's frequently brutal behavior, the [Superintendent] had repeatedly dismissed complaints against the officer without making any effort to consider the officer's prior history of misconduct, and the supervisor administered a "grossly deficient" and "bankrupt" complaint procedure that inhibited proper police discipline.

*Manarite*, at 956–57 (citing *Gutiérrez–Rodriguez*, 882 F.2d at 564–66). In contrast, the evidence in this case is insufficient to raise a material question regarding whether Chief King's conduct rose to the level of deliberate indifference required under Section 1983. "The question is not

whether the jailers did all they could have, but whether they did all the Constitution requires." *Rellergert v. Cape Girardeau County, Mo.*, 924 F.2d 794, 797 (8th Cir. 1991). Chief King's knowledge of an intoxicated detainee's suicide in the lockup in 1983, his failure to properly staff the police station, to install more sophisticated monitoring equipment in the lockup, to modify the cell doors and to order training in suicidal screening for his officers, taken together, are insufficient to establish that the risk of serious harm to the class of detainees was so great and obvious that Chief King willfully blinded himself to that risk. Read in the light most favorable to appellant, this evidence establishes that Chief King was perhaps very negligent, not "deliberately indifferent," to the risk that another detainee would commit suicide. *Manarite*, at 958 ("No case finds a supervisor 'deliberately indifferent' (or the like) simply because he does not react when he learns of a significantly increased suicide attempt rate.").

As discussed more fully earlier, Chief King had implemented policies and practices in 1986 that demonstrated an obvious concern to deal with the mental health needs of potentially suicidal detainees. The SOP mandated routine checks of detainees, and provided guidelines to be followed when a potentially suicidal detainee was identified. As part of the ordinary police training in May 1985 Manchester officers viewed a film on the subject of preventing custodial deaths. Furthermore, the City had a policy of removing from detainees any objects they could use to harm themselves, such as belts and chains.[21] In retrospect, one wishes that supplementary measures had been in place to prevent the tragedy in this case, but Chief King's failure to take additional action provides no basis for supervisory liability under Section 1983.

*Affirmed.*

---

21. Def. Exh. 14, at 6.