Stewart v. Robinson, et al.          CV-98-620-M    03/07/00 P
                  UNITED STATES DISTRICT COURT

                    DISTRICT OF NEW HAMPSHIRE


Diane Stewart, Individually
and as Guardian of the person
and Estate of George W. Stewart,
     Plaintiff

     v.                                Civil No. 98-620-M
                                       Opinion No. 2000 DNH 058
Dennis Robinson, Superintendent
Carroll County House of Correction, the
Carroll County Commissioners, Nathan Weeks,
Frank Holt, the Conway Police Department,
and John Doe Officers of the Conway
Police Department,
     Defendants


                         **O R D E R**


     Diane Stewart brings this action pursuant to 42 U.S.C. §

1983, seeking damages for alleged violations of her husband's

constitutionally protected rights.  She claims that as a result

of defendants' deliberate indifference to her husband's serious

medical (i.e., psychiatric) needs, he was "caused or allowed to

attempt his suicide by hanging while he was incarcerated at the

Carroll County House of Correction."  Second Amended Complaint,

para. 1.  She also asserts several state law claims, over which

she asks the court to exercise supplemental jurisdiction.  See 28 U.S.C. § 1367.

On November 17, 1999, plaintiff agreed to the dismissal of all claims against defendants Holt and Weeks.  See Stipulation of Dismissal (document no. 37).  The remaining defendants now move for summary judgment.  Plaintiff objects, and moves to amend her complaint for a third time, to name those officers of the Conway Police Department currently identified only as the "Doe defendants."

## Standard of Review

Summary judgment is appropriate when the record reveals "no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  When ruling upon a party's motion for summary judgment, the court must "view the entire record in the light most hospitable to the party opposing summary judgment, indulging all

2

reasonable inferences in that party's favor."  Griggs-Ryan v.
Smith, 904 F.2d 112, 115 (1st Cir. 1990).


**Background**

In the Fall of 1994, George Stewart pled guilty to an
indictment charging him with criminal threatening.  He was
sentenced to imprisonment at the New Hampshire State Prison for
one to three years, suspended for one year, and probation for
four years.

Approximately one year later, on October 22, 1995, Stewart
assaulted his wife, the plaintiff, who filed a complaint with the
Conway Police Department (the "CPD").  Based on her complaint,
officers of the CPD obtained a warrant for Stewart's arrest.
Later that day, a local gas station employee contacted the Conway
Police, informing them that he had just spoken with Stewart, who
threatened to drink a gallon of antifreeze.  Shortly thereafter,
CPD Officer Boothby found and arrested Stewart.

The following day, plaintiff filed a domestic violence petition against Stewart. CPD Officer Kevlin served Stewart with Orders of Notice later that morning. He then escorted Stewart to the Carroll County District Court for his arraignment on simple assault charges. The court set bail at $1,500. Additionally, at the request of his probation officer, Stewart was held on a 72 hour probation violation charge. Officer Domenic Richardi, a Corporal with the Carroll County Sheriff's Office, then took custody of Stewart and transported him to the Carroll County House of Corrections ("CCHC").

While plaintiff's factual allegations are sometimes confusing (even contradictory), it appears that none of the Conway police officers told Corporal Richardi of Stewart's reported threat to drink antifreeze. Consequently, it also appears that Richardi did not inform officials at CCHC that Stewart might be suicidal.[1]

---

[1] Early in her second amended complaint plaintiff alleges that, "The fact that George Stewart was suicidal was known to the transporting officer or other members of the Conway Police

4

On October 24, 1995, Nathan Weeks, a licensed social worker and psychiatric counselor, interviewed Stewart at the CCHC and concluded he was not a suicide risk. <u>See</u> Interrogatory answers of Nathan Weeks (Exhibit 3 to defendants' motion for summary judgment (document no. 28) and Exhibit B to document no. 41). Three days later, Stewart was served with a mittimus, executed by the Rockingham County Superior Court, informing him that his suspended sentence of one to three years (for the earlier criminal threatening conviction) was being brought forward because of his arrest on assault charges.

---

Department <u>who communicated to the staff</u> of the Carroll County House of Corrections that George Stewart had been identified as a suicide risk." Second amended complaint, para. 25 (plaintiff seems to be operating under the mistaken impression that a Conway police officer, rather than Corporal Richardi of the Sheriff's Department, transported Stewart to the CCHC. <u>See</u> Second amended complaint, para. 24). Later in her complaint, however, plaintiff alleges that, "The individual officer failed to take obvious steps to protect George Stewart by . . . <u>failing to advise</u> the receiving staff of the Carroll County House of Correction that George Stewart had been identified as a suicide risk." Second amended complaint, para. 55.

That same day, at approximately 5:30 p.m., a corrections officer at CCHC informed an inmate in the cell next to Stewart's that he would be back to check on the inmates at 6:00 p.m. Thirty minutes later, Stewart asked the neighboring inmate for the time. The inmate responded that it was 6:00 p.m. (the time at which the corrections officer was expected back on his rounds). Stewart handed the other inmate a note and asked that he mail it to his wife. Stewart then attempted to hang himself by tying a sheet around his neck and affixing it to one of the supports that held the upper of two bunks in his cell. The corrections officer discovered him approximately five minutes later. Regardless of his intentions (i.e., to actually kill himself or simply to make it appear that he was suicidal), Stewart survived the incident, but remains permanently injured and in a vegetative state. There is apparently little hope that Stewart will ever recover or regain consciousness. See Plaintiff's memorandum (document no. 31) at 24 (reporting that plaintiff has filed a request for approval of a "do not resuscitate" order with the Carroll County Probate Court "due to

6

the absence of any chance for improvement in George Stewart's condition.").

The note that Stewart prepared and handed to his neighboring inmate is addressed to his wife (plaintiff) and provides, in part, as follows:

> I was served with papers for my 1-3 today so you['re] not gonna get me into a mental ward, but I can with a suicide attempt. I have to go to a 72 hr. evaluation where I can bring up my past. I'm not giving up on keeping you or Jr. Please believe that I love you guys Diane and always will. But I listen to what you say and I need a certain type of help. This is the only way. . . . I have to take responsibility and do something for myself. . . I could lose you if I don't try to get myself some help.

Exhibit C, submitted with document no. 28. Both the timing of Stewart's conduct and the content of his note suggest that his suicide attempt was intentionally staged in a misguided effort to avoid incarceration at the state prison and, instead, obtain the psychiatric counseling that both he and his wife agreed he needed. Thus it might be incorrect to conclude or assume that Stewart was actually "suicidal." Nevertheless, regardless of

7

Stewart's intentions, it is clear that by the time he was discovered, he had sustained permanent injuries.

In her federal claims, plaintiff alleges that the CPD failed to adequately train its officers and neglected to adopt any appropriate procedures for dealing with potentially suicidal persons in their custody. She also claims that individual officers of the CPD failed to advise either Corporal Richardi (the transporting officer from the Sheriff's Department) or corrections officers at the CCHC that Stewart might pose a suicide risk. But see Second amended complaint at para. 25 (alleging that the transporting officers did advise CCHC officials that Stewart had been identified as a suicide risk).[2]

---

[2] Notwithstanding the contradictory allegations set forth in plaintiff's second amended complaint, the court will assume that her legal memoranda, which were prepared with the benefit of additional discovery, more accurately represent the precise nature of her claims. There, she appears to agree that there is no evidence suggesting that the County or corrections officers at CCHC were aware of Stewart's earlier alleged threat to drink antifreeze. See Plaintiff's memorandum (document no. 40) at 6.

8

Plaintiff also says that Dennis Robinson, in his official capacity as Superintendent of the CCHC, failed to take appropriate steps to prevent Stewart's suicide attempt, notwithstanding his (alleged) knowledge that Stewart presented a real and credible threat of suicide. Finally, as to the Carroll County Commissioners, plaintiff alleges that they failed to provide a suitable and reasonably safe correctional facility, in which Stewart might have been more closely monitored for suicidal behavior. She also claims that the County Commissioners failed to provide adequately trained health care professionals to identify and diagnose those inmates who might be suicidal.

## Discussion

Stewart was a pretrial detainee. Accordingly, the constitutional obligations owed to him by the various defendants flow from the provisions of the Fourteenth, rather than the Eighth Amendment. Nevertheless, the protections available to pretrial detainees under the Fourteenth Amendment "are at least as great as the Eighth Amendment protections available to a

9

convicted prisoner." <u>City of Revere v. Massachusetts General Hospital</u>, 463 U.S. 239, 244 (1983) (citing <u>Bell v. Wolfish</u>, 441 U.S. 520, 535 (1979)). Thus, at a minimum, defendants had a constitutional duty not to be "deliberately indifferent" to Stewart's serious medical needs. <u>See</u> <u>Estelle v. Gamble</u>, 429 U.S. 97, 106 (1976). <u>See also</u> <u>Torraco v. Maloney</u>, 923 F.2d 231, 234 (1st Cir. 1991) (holding that the Constitution also protects against deliberate indifference to an inmate's serious mental health needs).

I.    The "Doe Officers" of the Conway Police Department.

A.    <u>Legal Background</u>.

Construing plaintiff's ambiguous allegations in the light most favorable to her, the court will assume that the CPD officers failed to notify corrections officers at the CCHC that Stewart posed a potential suicide risk. The legal question then becomes whether they had a constitutional duty to do so. And, if they had (and breached) such a duty, whether they are entitled to qualified immunity. Finally, if they are not entitled to

10

qualified immunity, the court must determine whether the police officers' alleged conduct proximately caused Stewart's self-inflicted injuries.

In order to prevail on her section 1983 claims against the individual defendants, plaintiff must demonstrate that they acted intentionally or "with an analogous state of mind usually described as 'deliberate indifference' to deprivation of the victim's constitutional right." Manarite v. City of Springfield, 957 F.2d 953, 955 (1st Cir. 1992). Importantly, to establish "deliberate indifference," plaintiff must show more than that defendants were negligent. See id., at 956 ("The Supreme Court has also made clear that, by 'deliberate indifference,' it means more than ordinary negligence, and probably more than gross negligence."). See generally Farmer v. Brennan, 511 U.S. 825 (1994).

In cases involving the suicide of an inmate or pretrial detainee, the Court of Appeals for the First Circuit has observed:

> when liability for serious harm or death, including suicide, is at issue, a plaintiff must demonstrate "deliberate indifference" by showing (1) an unusually serious risk of harm (self-inflicted harm, in a suicide case), (2) defendant's actual knowledge of (or, at least, willful blindness to) that elevated risk, and (3) defendant's failure to take obvious steps to address that known, serious risk.

Manarite, 957 F.2d at 956. See also Bowen v. City of Manchester, 966 F.2d 13, 17 (1st Cir. 1992) ("Deliberate indifference requires a showing by the plaintiff that the public official had actual knowledge, or was willfully blind, to the serious risk that a detainee would commit suicide."); Elliott v. Cheshire County, New Hampshire, 940 F.2d 7, 10 (1st Cir. 1991) ("In a suicide case, a finding of deliberate indifference requires a strong likelihood, rather than a mere possibility, that self infliction of harm will occur.") (citation and internal quotation marks omitted); Colburn v. Upper Darby Township, 946 F.2d 1017, 1025 (3rd Cir. 1991) ("The 'strong likelihood' of suicide must be

12

'so obvious that a lay person would easily recognize the necessity for' preventative action; the risk of self-inflicted injury must be not only great, but also sufficiently apparent that a lay custodian's failure to appreciate it evidences an absence of any concern for the welfare of his or her charges.") (citation omitted).

In short, the "risk [of self-inflicted harm] must be large and strong, in order for constitutional (as opposed to tort) liability to attach." Elliott v. Cheshire County, 940 F.2d at 11. Additionally, plaintiff must establish that defendants knowingly ignored that substantial risk or, at a minimum, were willfully blind to its existence.

B.   Plaintiff's Motion to Amend Her Complaint.

Before considering plaintiff's legal claims against the individual police officers, however, her motion to amend the complaint must be resolved. In her third amended complaint, plaintiff proposes to identify the individual officers whom she

13

says are liable for Stewart's injuries.  Currently, those officers are identified only as the "Doe defendants."

The officers to be named object, asserting that plaintiff's motion to amend is untimely, because the pertinent statute of limitations has run, and she is not entitled to the benefit of the "relation-back" doctrine set forth in Rule 15(c) of the Federal Rules of Civil Procedure.

1.  <u>Tolling of the Pertinent Statute of Limitations</u>.

The parties agree that plaintiff's state and federal claims are governed by the three year statute of limitations found in New Hampshire Revised Statutes Annotated chapter 508.  They disagree, however, as to whether plaintiff is entitled to the benefit of that statute's tolling provision.

Plaintiff says her motion to amend is timely because New Hampshire law provides that "a mentally incompetent person may bring a personal action within 2 years after such disability is

removed." Plaintiff's motion to amend at 3 (quoting Hebert v. Manchester, 833 F.Supp. 80, 84 (D.N.H. 1993)). Accordingly, plaintiff asserts:

> Since his suicide attempt, George Stewart has been in a persistent vegetative state, and clearly incapacitated within the meaning of R.S.A. 508:8. The applicable statute is tolled even though the victim's incompetency was caused by and did not pre-exist the tortious act that gave rise to his cause of action. . . . In light of these facts, it is clear that the applicable statute of limitations has not yet run with respect to the Plaintiff's claims as to the individual police officers, and that she is entitled to file suit against them regardless of the application of the relation-back provisions of Federal Rule 15(c).

Plaintiff's motion to amend at 3-4. The court disagrees.

Plaintiff was appointed guardian of the Estate of George Stewart on January 22, 1996. On that date, she assumed the duty to protect and preserve Stewart's estate and the obligation "to prosecute or defend actions, claims or proceedings in any jurisdiction for the protection of the estate's assets." N.H. Rev. Stat. Ann. ("RSA") 464-A:26, I. She did not file her first amended complaint (naming the "Doe defendants") until February

15

11, 1999, substantially more than two years after her appointment as Guardian of the Estate of George Stewart (and more than three years after Stewart sustained his injuries). And then, she waited another nine months before moving to amend her complaint again, to specifically identify those defendants.[3]

Although the Court of Appeals for the First Circuit has yet to definitively rule on the propriety of allowing plaintiffs to name so-called "Doe defendants," this court has allowed the practice. It has, however, consistently required plaintiffs to specifically identify any unknown defendants prior to the expiration of the pertinent statute of limitations. See, e.g.,

---

[3] In her memorandum (document no. 31), plaintiff asserts that her original complaint "incorporated claims against the individual officers of the Conway Police Department identified only as 'John Doe Officers' [and] was filed within the three-year limitation period." Id., at 25. That assertion is incorrect. Although plaintiff did execute her state court writ (which was timely removed to this court) within the three year limitations period, she did not name the "Doe defendants" as parties to this action until she filed her First Amended Complaint, on February 11, 1999.

16

Allied Electronic Services, Inc. v. Doe Corporate Alter Egos, No. 93-62-M, slip op. (D.N.H. April 27, 1993).

Plaintiff argues that the applicable statute of limitations has not even begun to run, pointing to RSA 508:8, which provides: "An infant or mentally incompetent person may bring a personal action within 2 years after such disability is removed." Because Stewart remains in a persistent vegetative state (and is, therefore, incompetent), plaintiff says he remains disabled (mentally incompetent) and that disability is not likely to be removed. So, given that it is unlikely that Stewart will ever recover or regain consciousness, under plaintiff's theory, the statute of limitations will not begin to run until his death, perhaps decades from now.

Plaintiff's interpretation of New Hampshire's tolling provision is not without merit. Indeed it is consistent with the view adopted by a majority of jurisdictions that have considered similar statutes (the New Hampshire Supreme Court has yet to

17

confront the issue).  This court is persuaded, however, that the minority view - that the statute of limitations is tolled only until the appointment of a capable guardian - is better reasoned and both gives effect to society's compelling interest in effectively protecting the rights of those who are disabled (like Stewart in this case), while also serving the important interests underlying statutes of limitations.  The court is also satisfied that, if presented with this issue, the New Hampshire Supreme Court would interpret the statute in a manner consistent with what is currently the minority, but the more sensible, view.  See generally Federal Deposit Ins. Corp. v. Ogden Corp., ___F.3d___, 2000 WL 124369 at *5 (1st Cir. Feb. 7, 2000) ("As to matters about which the [state Supreme Court] has not spoken, we take a predictive approach and seek guidance from other persuasive case law, learned treatises, and pertinent public policy considerations.").  See also Moores v. Greenberg, 834 F.2d 1105, 1107 n.3 (1st Cir. 1987).

18

When plaintiff was appointed guardian of the Estate of George Stewart, she was vested not only with the right, but the obligation to bring the present civil action. See RSA 464-A:26 ("It is the duty of the guardian of the estate to protect and preserve it . . . [and] to prosecute or defend actions, claims or proceedings in any jurisdiction for the protection of the estate's assets . . ..") (emphasis supplied). At the time of her appointment, she was completely familiar with the circumstances giving rise to Stewart's injuries and was on notice that viable causes of action against various municipal and individual defendants might exist.

Construing New Hampshire's tolling provision as operating until a guardian (with full authority to pursue claims on behalf of the ward) is appointed, reconciles two competing public policies implicated by cases such as this. First, the disabled ward's rights are completely protected until some responsible person is appointed to act for him or her and is vested with the legal authority (and, in fact, the duty) to pursue the ward's

claims. Such a construction also protects the ward's substantial interests because it encourages his or her guardian to collect relevant evidence and conduct pertinent discovery in a timely fashion, before relevant information is lost or witnesses' memories fade, and while potential defendants remain available. (The ward is also protected insofar as he or she might bring a claim against the guardian if an action is negligently filed after the applicable statute of limitations expires.) Second, potential defendants are also protected from having to defend suits in which otherwise stale claims might be brought many years, or even decades, after the precipitating events occurred.

In sum, then, construing New Hampshire's tolling provision in that manner serves several interests: (1) it protects a ward's legal rights for an additional two years after a guardian acquires the legal ability to vindicate those rights; (2) it encourages guardians to act in a timely manner to preserve and prosecute claims of the ward, gather relevant evidence, and identify potential defendants, cf. RSA 556:7 (providing that the

administrator of an estate may pursue a claim which existed in favor of the deceased at the time of his or her death for one year after the administrator's appointment); and (3) it protects defendants from potentially timeless liability.

Accordingly, the statute of limitations was not tolled during the entirety of Stewart's incapacity (which continues to this day). When plaintiff was appointed guardian of his estate, Stewart's disability was, at least for purposes of this case, effectively removed, and the two-year limitations period set forth in RSA 508:8 began to run. As the North Carolina Supreme Court has observed:

> The policy of repose which underlies statutes limiting the time in which actions may be brought would be imperfectly expressed if these statutes did not apply to all those who might bring such actions, and actions which might be brought in their behalf. On that theory, the representation of the ward by the guardian should be complete as to actions which the guardian might bring and which it was incumbent on him to bring, in so far as may be consistent with the limitations of his office. . . . [O]rdinarily, the failure of the guardian to sue in apt time is the failure of the ward, entailing the same legal consequence with respect to the bar of the statute. Exposure to a suit by the

21

> guardian - one which was within the scope of both his
> authority and duty - for a sufficient length of time,
> would constitute a bar to the action of the ward.

Johnson v. Pilot Life Ins. Co., 7 S.E.2d 475, 477-78 (N.C. 1940).

See also Zator v. State Farm Mutual Auto. Ins. Co., 752 P.2d

1073, 1075 (Haw. 1988) ("A guardian of the property of a disabled

person has the power to prosecute claims for the protection of

assets unless otherwise limited. . . . Absent such limitations

[the guardian's] appointment gave her the right of action to

bring [her ward's] claim.  Consequently, we hold that the statute

of limitations commenced running upon her appointment."); First-

Citizens Bank & Trust v. Willis, 125 S.E.2d 359 (N.C. 1962)

("While the personal disability of insanity remained with the

[ward] when the guardian was appointed for her . . ., the

disability to [bring a legal claim] was removed.  We therefore

hold that the statute began to run against her right to [bring a

legal claim] from that date and she is now barred.").  See

generally, William Schrier, Note, 71 B.U. L. Rev. 575 (1991).

Accordingly, plaintiff had either three years from the date of Stewart's injuries (see RSA 508:4) or two years from the date of her appointment (see RSA 508:8), whichever was later, to specifically identify the defendants against whom she was proceeding. She failed to do so. In fact, she did not even include the "Doe defendants" in her complaint within that period. Consequently, her motion to amend her complaint for a third time, to specifically identify the "Doe defendants," is denied as untimely. See, e.g., Cox v. Treadway, 75 F.3d 230, 240 (6th Cir. 1996) ("new parties may not be added after the statute of limitations has run . . ."); Barrow v. Wethersfield Police Dept., 66 F.3d 466, 468 (2d Cir. 1995) ("We have stated that it is familiar law that 'John Doe' pleadings cannot be used to circumvent statutes of limitations because replacing a 'John Doe' with a party in effect constitutes a change in the party sued.") (citation and internal quotation marks omitted).

2.    <u>Relation Back Under Rule 15(c)</u>.

Plaintiff next says that even if her complaint against the "Doe defendants" is ruled untimely, she is still entitled to amend her complaint and name those defendants under the "relation back" doctrine set forth in Rule 15(c) of the Federal Rules of Civil Procedure.  <u>See generally</u> <u>Wilson v. U.S. Government</u>, 23 F.3d 559, 562 (1st Cir. 1994) ("When a plaintiff amends a complaint to add a defendant, but the plaintiff does so <u>subsequent</u> to the running of the relevant statute of limitations, then Rule 15(c)(3) controls whether the amended complaint may 'relate back' to the filing of the original complaint and thereby escape a timeliness objection.") (emphasis supplied).

Rule 15(c) is intended to benefit a plaintiff who inadvertently identifies the wrong party in his or her complaint. <u>See, e.g.</u>, <u>Brink v. First Credit Resources</u>, 57 F.Supp.2d 848, 856 (D.Ariz. 1999).  So, the rule allows a plaintiff to amend the complaint to correct such a misidentification by "chang[ing] the party or the naming of the party against whom a claim is

24

asserted," provided that party "knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against the party."  Fed. R. Civ. P. 15(c) (emphasis supplied).

Thus, Rule 15(c) is not a license to add new parties to a suit after the statute of limitations has expired.  Instead, it provides a means by which a plaintiff might amend his or her complaint to correctly identify defendants who were misidentified in the original complaint (and who received timely notice that, but for the plaintiff's mistake, they would have been named in the original complaint).

Plainly, Rule 15(c) has no application in this case.  See generally Wilson v. United States Government, supra.  See also Rendall-Speranza v. Nassim, 107 F.3d 913, 919 (D.C. Cir. 1997) ("In the adversarial system of litigation the plaintiff is responsible for determining who is liable for her injury and for doing so before the statute of limitations runs out; if she later

25

discovers another possible defendant, she may not merely by invoking Rule 15(c), avoid the consequences of her earlier oversight."). Plaintiff did not "misidentify" any defendants in her original complaint. She clearly and unambiguously identified the Superintendent, Carroll County, and the CPD (as well as the two individual defendants whom plaintiff voluntarily dismissed earlier). Her original complaint made no mention of the "Doe" defendants.

Having failed to demonstrate that she has met the requirements of Rule 15(c), plaintiff cannot rely upon that rule as authority for her untimely motion to amend the complaint. And, because plaintiff's claims against the individual officers of the CPD were not raised within the pertinent limitations period, they are dismissed with prejudice.

## II. The Conway Police Department.

Plaintiff alleges that the CPD breached "a duty to take reasonable and obvious measures to protect George Stewart from a

26

foreseeable risk of harm, including a suicide attempt." Second Amended Complaint, para. 50. Additionally, she claims that the CPD failed to maintain a proper policy, one which would have required its officers to report Stewart's potential suicide risk to the Sheriff who transported him to the correctional facility. Id., para. 52.

It is well established that a municipal entity cannot be held liable under 42 U.S.C. § 1983 on a theory of respondeat superior or vicarious liability; the municipality itself must proximately cause the constitutional injury, through the promulgation (or tacit approval) of a municipal policy or custom. See City of Canton, Ohio v. Harris, 489 U.S. 378, 385 (1989). See generally Monell v. New York City Dept. of Social Services, 436 U.S. 658 (1978). And, a § 1983 plaintiff must demonstrate that the challenged municipal custom or policy was the "moving force" behind the constitutional injuries at issue. Board of County Commissioners of Bryan County v. Brown, 520 U.S. 397, 404 (1997).

So, to survive the Police Department's motion for summary judgment, plaintiff must point to some admissible evidence tending to establish that: (a) one or more officers of the CPD violated Stewart's constitutionally protected rights; and (b) the officers' conduct either implemented or was undertaken pursuant to a "policy statement, ordinance, regulation, or decision officially adopted and promulgated by [the County's] officers." Monell, 436 U.S. at 690. To carry her burden with regard to the first element, plaintiff must point to some admissible evidence suggesting that defendants were "deliberately indifferent" to the possibility that Stewart was suicidal. And, as discussed above, to satisfy that burden, she must show that Stewart presented an unusually serious risk of self-inflicted harm, that defendants had actual knowledge of (or were at least willfully blind to) that elevated risk, and that defendants failed to take obvious steps to address that known, serious risk. See Manarite, 957 F.2d at 956.

To carry her burden with regard to the second element, plaintiff must establish that:

> through its <u>deliberate</u> conduct, the municipality was the "moving force" behind the injury alleged. That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights.

<u>Board of County Commissioners of Bryan County v. Brown</u>, 520 U.S. at 404 (emphasis in original). <u>See also</u> <u>Pembaur v. Cincinnati</u>, 475 U.S. 469, 483 (1986); <u>Roma Construction Co. v. aRusso</u>, 96 F.3d 566, 575 (1st Cir. 1996); <u>Bordanaro v. McLeod</u>, 871 F.2d 1151, 1155-56 (1st Cir. 1989); <u>Malachowski v. City of Keene</u>, 787 F.2d 704, 711 (1st Cir. 1985). Plaintiff has failed to carry her burden as to this second element; she has pointed to no evidence which, if credited as true, would establish that Stewart's constitutional rights were violated as a result of a custom or policy promulgated (or knowingly tolerated) by the CPD.

Plaintiff describes her § 1983 claim against the CPD as follows:

29

In this case, the Conway Police Department admits that it had no program for the detection and prevention of suicide in its facilities, other than a suicide evaluation form which was not used by the John Doe officers to evaluate George Stewart. The Defendant also acknowledges that it does not provide any training to its officers relative to suicide detection and prevention. While the Defendant clearly recognized the potential for detainees to commit suicide by preparing a suicide evaluation form for detainees, it made a deliberate choice not to train its officers or implement a program for suicide detection and prevention.

Plaintiff's memorandum at 16. There are several problems with plaintiff's claim. First, Stewart did not injure himself while in the custody of the CPD; his self-inflicted injuries were sustained four days later, while he was detained at the correctional facility maintained by the County.

Moreover, plaintiff acknowledges that the CPD actually did have in place a policy for identifying potentially suicidal detainees that, among other things, required officers to complete an intake form, on which they assessed a detainee's potential risk for suicide. The CPD officers apparently recognized that

30

Stewart posed a possible suicide threat and, therefore, implemented at least some measures to insure that he did not injure himself. That the officers allegedly failed to complete the available intake form (and pass it along to officials at the CCHC), merely suggests the possibility that they were negligent.[4]

Notwithstanding the possible negligence of the Conway Police Officers involved in this case, plaintiff has failed to point to sufficient evidence which, if credited as true, would support a Monell-type claim against their employer, the CPD. This is

_____

[4] The State Police Investigation Report prepared after Stewart's suicide attempt and submitted by plaintiff noted, among other things, that the CPD had (and the officers reportedly followed) departmental procedures relating to the detention of individuals believed to pose a suicide risk. That policy apparently required officers to: (1) notify the shift supervisor about the incident giving rise to the officers' concern for the detainee; (2) secure the detainee in a cell and remove any objects which might facilitate a suicide attempt; and (3) notify the dispatcher so the detainee might be monitored by video camera. The State Police report also noted that the Conway Police Officers did not complete the intake/suicide evaluation form because the officers were already aware of Stewart's "suicide statements/gestures." N.H. State Police Criminal Investigation Report, Case No. E-95-0789I (12/9/95), Exhibit G to plaintiff's memorandum.

particularly true in light of the fact that plaintiff has neglected to disclose (and, necessarily, failed to cite) any expert testimony supportive of her assertion that the suicide prevention procedures adopted by the CPD were deficient, much less the equivalent of deliberate indifference to the risk of detainee suicide.

With regard to her failure to train claim, plaintiff must establish that "the need for more or different training [was] so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the [Police Department] can reasonably be said to have been deliberately indifferent." City of Canton, Ohio v. Harris, 489 U.S. at 390. Again, plaintiff has presented no expert testimony in support of her claim. Even if expert testimony were not required, plaintiff would be required to establish that the Department knew of prior suicides (or possibly even suicide attempts) by individuals in its custody and either deliberately chose not to provide officers with training in suicide risk identification and suicide prevention, or

32

acquiesced in an established practice or custom of providing no training in this area.  See Simmons v. City of Philadelphia, 947 F.2d 1042, 1064 (3rd Cir. 1991) ("As a predicate to establishing her concomitant theory that the City violated Simmons's rights by means of a deliberately indifferent failure to train, plaintiff must similarly have shown that such policy-makers, likewise knowing of the number of suicides in City lockups, either deliberately chose not to provide officers with training in suicide prevention or acquiesced in a longstanding practice or custom of providing no training in this area.").  Plaintiff would certainly have to present evidence suggesting that the CPD was aware of a "substantial risk" that detainees in its custody might attempt suicide if its officers were not provided with better training, in order to prevail.  See Bowen v. City of Manchester, 966 F.2d 13, 18-19 (1st Cir. 1992).  The record contains no such evidence.

Finally, plaintiff has failed to present any admissible evidence that might establish a causal connection between the

33

Conway Police Department's alleged failure to train its officers and Stewart's subsequent attempt to take his life, four days after he left the CPD, while in the custody of CCHC. See Santiago v. Fenton, 891 F.2d 373, 381 (1st Cir. 1989) (a plaintiff must show "both the existence of a policy or custom and a causal link between that policy and the constitutional harm"). See also City of Canton, Ohio v. Harris, 489 U.S. at 391; Buffington v. Baltimore County, Maryland, 913 F.2d 113, 122-23 (4th Cir. 1990). The CPD is, therefore, entitled to judgment as a matter of law on plaintiff's § 1983 claims.

III. Plaintiff's Claims Against the Superintendent and County.

Plaintiff also asserts claims against the Superintendent of the CCHC and Carroll County. Her claim against the Superintendent in his official capacity is, in effect, a suit against the County. See Negron Gaztambide v. Hernandez Torres, 145 F.3d 410, 416 (1st Cir. 1998) ("Official-capacity suits . . . generally represent only another way of pleading an action against an entity of which an officer is an agent. . . . [A]n

34

official-capacity suit is, in all respects other than name, to be treated as a suit against the entity.") (quoting Kentucky v. Graham, 473 U.S. 159, 165 (1985) cert. denied, 525 U.S. 1149 (1999).

As with her claim against the CPD, to prevail against the County defendants, plaintiff must demonstrate that Stewart's injuries were the product of a municipal custom or policy. She must also show that the challenged custom or policy was "so well settled and widespread that the policymaking officials of the municipality can be said to have either actual or constructive knowledge of it yet did nothing to end the practice." Bordanaro v. McLeod, 871 F.2d 1151, 1156 (1st Cir. 1989).

And, as with her claims against the CPD, to prevail against the County, plaintiff must also demonstrate that Stewart's injuries were proximately caused by the municipal custom or policy at issue. Thus, she must show that the challenged municipal custom or policy acted as the "moving force" behind

Stewart's injuries.  It is insufficient for her merely to allege that the County's correctional facility could have been better designed or that additional measures could have been implemented to prevent inmate suicide attempts.  See, e.g., Bowen, 966 F.2d at 18 ("In the context of pre-trial detention suicides, a municipality will not be liable for failing to maintain a suicide-proof facility or for an isolated, negligent act committed by one of its police officers.").

In response to the County's motion for summary judgment, the sole claim which plaintiff advances is that the Superintendent and the County violated Stewart's constitutionally protected rights by "knowingly maintain[ing] a substandard facility as its inadequacies were obvious, and they were specifically informed by a jail consultant and former correctional commissioner that the facility was not suitable and was 'a lawsuit waiting to happen.'" Plaintiff's memorandum at 6-7.  Plaintiff has abandoned her claim that the Superintendent and/or County is liable for having failed to properly screen Stewart for suicide risks or for having failed to adequately train personnel at the CCHC.  See id. Consequently, for the reasons set forth in defendants' memorandum

in support of summary judgment (document no. 29), defendants are entitled to judgment as a matter of law as to those claims.

In support of her claim that the County defendants were deliberately indifferent to Stewart's constitutionally protected rights insofar as they maintained a "defective" jail, plaintiff points to the affidavit of Raymond Helgemoe, a criminal justice consultant and former Commissioner of Corrections, who testified: "I personally recall having advised Dennis Robinson, the jail Superintendent, prior to George Stewart's suicide attempt, that Cell Block B was 'a lawsuit waiting to happen.'" Helgemoe affidavit at 2. It is, however, unclear precisely why Helgemoe believed that Cell Block B posed a potential risk to inmates or whether he communicated the reasons for his concerns to the Superintendent or the County. Those concerns may have been due to the facility's size, overcrowding issues, potentially inadequate heat, cooling, or ventilation, or any other of a number of factors wholly unrelated to the possibility that the

layout or structure of Cell Block B might unreasonably facilitate an inmate's suicide attempt.[5]

Nothing in the record suggests that the Superintendent and/or the County were aware that Stewart posed a suicide risk. To the contrary, plaintiff concedes that neither the Superintendent nor the County defendants were aware of Stewart's alleged threat to commit suicide by drinking antifreeze. And, the report prepared by Mr. Weeks, a licensed social worker and psychiatric counselor, suggested that Stewart did not pose any threat of suicide.

Perhaps more importantly, what is equally clear from the record is that there is no evidence that any other inmate at CCHC had tried to commit suicide prior to the incident involving George Stewart. And, nothing in the record suggests that

---

[5]     The deadline for disclosure has past and plaintiff has failed to disclose the identity of any expert witnesses on which she relies in support of her claims. Consequently, she has no expert testimony (aside from the somewhat ambiguous affidavit of Mr. Helgemoe) to support her claim that Cell Block B posed a substantial threat to the safety of potentially suicidal inmates - a threat with regard to which defendants were allegedly "deliberately indifferent."

38

defendants were aware (and "deliberately indifferent" or "willfully blind" to the fact) that the cells in Cell Block B might pose a potential danger to suicidal inmates.

In light of the record presented, the court is compelled to conclude that plaintiff has failed to establish any genuine issue of material fact which might preclude the entry of summary judgment in favor of the Superintendent and the County.  Nothing in the record even remotely supports plaintiff's claim that those defendants were "deliberately indifferent" to a "serious threat" that an inmate might attempt suicide while housed in Cell Block B.  Nor is there evidence to suggest that defendants knew or should have known that the cells in that portion of the jail posed an unreasonable danger to potentially suicidal inmates. Consequently, as to counts one and two of plaintiff's complaint, defendants are entitled to judgment as a matter of law.

## Conclusion

For the foregoing reasons, each of the remaining defendants is entitled to judgment as a matter of law on plaintiff's federal claims.  Accordingly, as to plaintiff's causes of action brought

39

pursuant to 42 U.S.C. § 1983, defendants' motions for summary judgment (documents no. 28 and 29) are granted. The court declines to exercise supplemental jurisdiction over plaintiff's remaining state law claims, which are remanded to state court. See Camelio v. American Federation, 137 F.3d 666 (1st Cir. 1998) (having dismissed federal claims, district court should have refrained from exercising supplemental jurisdiction over remaining state claims).

Plaintiff's motion to amend her complaint for the third time (document no. 32) is denied and her claims against the "Doe defendants" are dismissed with prejudice. The motion for summary judgment submitted by defendants Holt and Weeks (document no. 30) is denied as moot, in light of plaintiff's having agreed to the dismissal of all claims against those defendants. The Clerk of Court shall enter judgment in accordance with this order and close the case.

   **SO ORDERED.**

                                    _____
                                    Steven J. McAuliffe
                                    United States District Judge

March 7, 2000

cc:  Charles A. Meade, Esq.
     Stephen J. Schulthess, Esq.
     William G. Scott, Esq.
     Donald E. Gardner, Esq.